WILMINGTON CITY RY. CO. et al. v. TAYLOR et al., Board of Public Utility Com'rs of City of Wilmington.

(District Court, D. Delaware. March 5, 1912.)

No. 310.

1. CONSTITUTIONAL LAW (§§ 210, 252*)—FOURTEENTH AMENDMENT—PROTECTION OF PROPERTY—DUE PROCESS OF LAW—EQUAL PROTECTION OF LAW.

Corporations, equally with individuals, are within the protection of the fourteenth amendment of the federal Constitution with respect to their property, so that, subject to a legitimate exercise of the police power, no state can deprive them of their property without due process of law, or deny them the equal protection of the laws, which prohibition is leveled against such deprivation or denial by a state whether by direct act of the Legislature or by any other state instrumentality.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 679, 680, 728–731; Dec. Dig. §§ 210, 252.*]

2. CARRIERS (§ 10*)—PUBLIC UTILITY BOARD.

The public utility board for the city of Wilmington, created by Act March 29, 1911 (26 Del. Laws, c. 206), with power to supervise public utilities operating in that city, is an instrumentality of the state for the accomplishment of public purposes, and its acts concerning matters committed to it, though irregular, wrongful, or illegal, are acts of the state.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 14–20; Dec. Dig. § 10.*]

3. CONSTITUTIONAL LAW (§ 318*)—DUE PROCESS OF LAW—PUBLIC UTILITY COMMISSION—STREET RAILROAD RATES—INVESTIGATION.

Where a citizen instituted a proceeding before the Wilmington public utility board to compel certain street car companies to resume the sale of 6 fare tickets for 25 cents, it was sought by such proceeding to deprive the railway companies of their property, which could only be done by due process of law, which required a tribunal having jurisdiction, notice, and an opportunity for a fair hearing and defense.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 949; Dec. Dig. § 318.*]

4. CARRIERS (§ 2*)—CONSTITUTIONAL LAW (§ 318*)—DUE PROCESS OF LAW—STREET RAILROAD RATES—REDUCTION BY PUBLIC UTILITY BOARD—FAIR HEARING.

A citizen instituted proceedings before the Wilmington public utility board to compel certain street railway companies to resume the sale of 6 fares for 25 cents by the mere filing of a communication addressed to the board, complaining that the companies had abolished the sale of such tickets, and asking that they be summoned to appear and present reasons for such action, without alleging that such discontinuance was unlawful or unreasonable. The railway companies appeared and claimed that such discontinuance was within their chartered authority and legal rights, and offered to establish the same by proof; but the board, on the advice of its attorney, without forming or promulgating any rules for the conduct of the hearing, notified the companies that the board would not take into consideration the chartered rights and franchises thereof,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

whereupon the board, without considering the reasonableness or legality of the change in rates, passed an order requiring the companies to resume the sale of 6 fares for 25 cents. *Held*, that such inquiry did not disclose either judicial or legislative impartiality on the part of the board between complainant and the railroad companies and did not amount to due process of law.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 4, 5; Dec. Dig. § 2;* Constitutional Law, Cent. Dig. § 949; Dec. Dig. § 318.*]

**5.** CARRIERS (§ 12*)—STREET RAILROADS—FARES—REASONABLENESS.

Where certain street railroads, after having sold 6 fares for 25 cents for 10 years, discontinued such sale and charged a straight 5-cent fare,. the presumption, if any, arising from the previous long sale at the lower .rate, that such rate was reasonable, was a rebuttable one, so that, in a proceeding before a public utility board to compel the resumption of the lower rate, the railway companies were entitled to make a full defense on the law as well as on the facts. .

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7-20; Dec. Dig. § 12.*]

**6.** CARRIERS (§ 12*)—FARES—REGULATION—STREET RAILROADS.

On an issue as to the reasonableness of a straight 5-cent fare charged by street railroad companies, the fact that another trolley line may have sold 6 fares for 25 cents was wholly inconclusive, the reasonableness of the rate depending on the excellence of service, commodiousness of cars, cost of construction and maintenance, change in wages paid to employés, and other circumstances which might justify an increase in the price.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7-20; Dec. Dig. · § 12.*]

**7.** COURTS (§ 282*)—FEDERAL COURTS—JURISDICTION—FEDERAL LAWS.

Diversity of citizenship is unnecessary to confer federal jurisdiction, where complainant pleads a threatened deprivation of its property without due process of law by a board of public utility commissioners acting as a representative of the state.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 820-824; Dec. Dig. § 282.*]

**8.** COURTS (§ 282*)—FEDERAL COURTS—JURISDICTION—FEDERAL CONSTITUTION —DUE PROCESS OF LAW.

Where a public utility board, acting as an instrumentality of the state, ordered complainants—street railway companies—to resume the sale of 6 fares for 25 cents without affording complainants a full and fair hearing on the merits so as to constitute due process of law, such order constituted a violation of complainants' rights, guaranteed by the federal Constitution, regardless of the provisions of the state Constitution and laws; and hence complainants were not bound to seek relief in the state courts either by appeal or original suit, but were entitled to invoke the jurisdiction of the federal courts, on the ground that the suit arose under the Constitution and laws of the United States, to restrain the enforcement of such order.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 820-824; Dec. Dig. § 282.*

Jurisdiction of actions involving federal questions, see notes to Bailey v. Mosher, 11 C. C. A. 308; Montana Ore-Purch. Co. v. Boston & N. C. C. & S. Min. Co., 35 C. C. A. 7; Earnhart v. Switzer, 105 C. C. A. 262.]

**9.** CARRIERS (§ 18*) — STREET RAILROADS — REGULATION — PUBLIC UTILITY BOARD—POWERS—APPEAL.

Under Act March 29, 1911 (26 Del. Laws, c. 206), creating the Wilmington public utility board, with power to supervise and regulate street railways and other public utility corporations in that city, with power to fix

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

rates, etc., and also providing for an appeal from any order of the board to the superior court, which is given jurisdiction to hear and determine the appeal on the merits of the matters forming the basis of the order, the utility board, and not the court, is the body having the last legislative word in a determination of the reasonableness of rates, its order being a legislative act by an instrumentality of the state exercising delegated authority, so that on an appeal the court's duty is limited merely to an affirmance or reversal, without jurisdiction to amend or correct the order of the board or substitute another order therefor.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 13, 16–18, 20, 24; Dec. Dig. § 18.*]

**10.** CARRIERS (§ 18*)—REGULATION—FARES—APPEAL.

An appeal from an order of the Wilmington public utility board requiring traction companies to resume the sale of 6 fares for 25 cents, authorized by Act March 29, 1911 (26 Del. Laws, c. 206), is confined to the record of the proceedings before the utility board as certified by its secretary, so that where, by the action of the board, the railway companies were not permitted to present by way of defense to a prima facie case made against them matters of law or fact deemed by them to be essential as affecting the merits, they could obtain no relief by appeal.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 13, 16–18, 20, 24; Dec. Dig. § 18.*]

**11.** CARRIERS (§ 18*)—REGULATION OF CHARGES—RIGHT TO RELIEF—ADEQUATE REMEDY AT LAW.

Where certain street railway companies were ordered by a public utility board to resume the sale of 6 fares for 25 cents as a result of proceedings which did not afford due process of law and were ordered to pay a penalty of $100 a day if they failed to comply with the order, they had no adequate remedy at law, and were therefore entitled to apply for relief by injunction.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 13, 16–18, 20, 24; Dec. Dig. § 18.*]

**12.** INJUNCTION (§ 135*)—PRELIMINARY INJUNCTION—ISSUANCE.

The granting or refusal of an injunction, whether mandatory or preventive, calls for the exercise of sound judicial discretion in view of all the circumstances of the particular case; regard being had to the nature of the controversy, the object for which the injunction is being sought, and the comparative hardship or convenience to the respective parties involved in the award or denial of the writ.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. § 304; Dec. Dig. § 135.*]

**13.** INJUNCTION (§ 132*)—PRELIMINARY INJUNCTION—OBJECT.

A preliminary injunction is a mere provisional remedy, the legitimate object of which is the preservation of the property or rights in controversy until the decision of the case on a full and final hearing on the merits or the dismissal of the bill for want of jurisdiction or other sufficient cause.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. § 302; Dec. Dig. § 132.*]

**14.** INJUNCTION (§ 137*)—PRELIMINARY INJUNCTION—ISSUANCE.

Where, in a doubtful case, the denial of an injunction on the assumption that the complainant ultimately will prevail would result in greater detriment to him than, on a contrary assumption, would be sustained by the defendant through its issuance, the injunction should usually be granted; the balance of convenience or hardship being ordinarily a factor of controlling importance in cases of substantial doubt either as to

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the law or facts of the case, or both, existing at the time of the granting or refusing of the writ.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 307–309; Dec. Dig. § 137.*]

15. INJUNCTION (§ 137*)—PRELIMINARY INJUNCTION—OBJECT.

Where the sole object for which a preliminary injunction is sought is the protection of property or legitimate business or the maintenance of the status quo until the question of right between the parties can be decided on the final hearing, the injunction may be allowed, even though there be serious doubt of the ultimate success of the complainant.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 307–309; Dec. Dig. § 137.*]

In Equity. Suit by the Wilmington City Railway Company and others to restrain Henry M. Taylor and others, constituting the Board of Public Utility Commissioners for the City of Wilmington, from enforcing an order requiring defendants to resume the sale of six street railway tickets within the City of Wilmington for twenty-five cents. On application for a temporary injunction. Granted.

Herbert H. Ward and John F. Neary, both of Wilmington, Del., for complainants.

Daniel O. Hastings, City Sol., of Wilmington, Del., for respondents.

BRADFORD, District Judge. In this case the Wilmington City Railway Company, hereinafter called the city railway company, the Front and Union Street Railway Company, hereinafter called the Front Street company, Wilmington and Edgemoor Electric Railway Company, hereinafter called the Edgemoor company, and Wilmington and Philadelphia Traction Company, hereinafter called the traction company, have applied for a preliminary injunction to restrain until the determination of the case or the further order of the court Henry M. Taylor, Samuel G. Cleaver, Joseph Jackson Pierce, William H. Vance and C. Frederick Bacher as members of and constituting the Board of Public Utility Commissioners for the City of Wilmington, hereinafter called the utility board, its servants, etc., from enforcing or attempting to enforce by suit or otherwise a certain order made by that board September 1, 1911, directing the traction company to renew, beginning with the starting of its cars September 20, 1911, the sale of six tickets for twenty-five cents, commonly known as strip tickets, within the city of Wilmington, which tickets when sold should entitle the holders thereof respectively to the same rights and privileges as to the fare or ride and transfer on the cars of that company in the city of Wilmington as were given to its passengers immediately prior to August 13, 1911; and further directing that the traction company in default of compliance with the above order should be subject to and should pay a penalty of one hundred dollars per day for the violation thereof. The utility board was created by act of assembly March 29, 1911, chapter 206, vol. 26, Del. Laws. Section 3 provides, among other things, that the board "shall have power to make all needful rules and regulations for its government and proceedings" and "may engage the services of experts to assist them in arriving at the proper deter-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

mination of any question that may be brought before them for determination." Section 4 is as follows:

"Section 4. The said Board shall have supervision over all public utilities operating within the limits of the said City of Wilmington; and the term 'Public Utilities' as used in this act is herein defined to include all street railway, express, traction, gas, electric light, heat and power, water, telephone and telegraph corporations, associations or joint stock companies operating within the limits of the City of Wilmington for public use. The said Board shall have general supervision over all public utilities as herein defined, within the limits of the City of Wilmington, and shall have power, after hearing upon notice, by order in writing:

"a. To require every such public utility as herein defined to comply with the laws of this State relating thereto or with any legally adopted ordinance or regulation of the said City of Wilmington or with any of the terms of the franchise under which such public utility operates.

"b. To require every such public utility as herein defined to furnish safe and adequate service.

"c. To require every such public utility as herein defined to keep its books, records and documents so as to afford an intelligent understanding of its business.

"d. To direct any such public utility as herein defined, found to be granting unjust, unfair or unreasonable discriminations, to immediately cease from so doing.

"e. To investigate any accident happening in the said City of Wilmington in connection with any such public utility as herein defined.

"f. To hear and examine complaints concerning rates charged by any such public utility as herein defined, and to make such recommendations and orders as it may deem proper concerning such rates.

"g. To make such recommendations as it may see fit to concerning such public utility as herein defined, and to see that all laws of the State and all lawful ordinances of the City of Wilmington are complied with by such public utility, and it shall cause action to be brought against any such public utility violating any such law or ordinances through the Attorney General of the State of Delaware or the City Solicitor of the City of Wilmington."

Section 5 provides, among other things, that the board "shall have the power to compel the attendance of witnesses and the production of books, papers, accounts and documents, to swear witnesses and to issue subpœnas." Section 6 is as follows:

"Section 6. All orders made by said Board pursuant to the power and authority given by this act, shall be served on the public utility to be affected thereby, within a reasonable time after such order is made by the delivery of a certified copy thereof to the person to be affected thereby, or to any officer or agent of any corporation, association or joint stock company upon whom a summons may be served in accordance with the provisions of the laws of this State. Such order or orders shall take effect within a reasonable time, such time to be fixed in such order. Within thirty days from the date of service of any such order or orders, any party to the proceedings, person or company affected may appeal from such order or orders to the Superior Court of the State of Delaware, by filing a notice of appeal, setting forth the order appealed from, with the Prothonotary of the said Court, which said Court is hereby given jurisdiction to hear and determine such appeal on the merits of the matters forming the basis of the order. The taking of an appeal shall not stay the operation of the order appealed from but a stay may be granted by the Court in its discretion, either with or without terms and conditions. The form of procedure, except as herein outlined, shall be prescribed by the said Court by rule. In default of compliance with the said order when the same shall have become operative, said person, corporation, association or joint stock

company, upon whom said order shall have been made, shall be subject to a penalty not exceeding one hundred dollars per day for the violation thereof, to be recovered in the said Superior Court in an action of debt at the suit of the Board."

Section 9 provides that the city solicitor of Wilmington "shall be the legal adviser for the said Board."

The city railway company was chartered February 4, 1864, chapter 406, vol. 12, Del. Laws, with power to "locate, construct, operate and maintain a city railway for the carriage of passengers and freight for compensation within the city of Wilmington, with the privilege also of extending such railway to any place or places outside of the city, not more than six miles distant from the city limits." By an amendment to its charter, passed March 26, 1891, chapter 187, vol. 19, Del. Laws, it was provided that the company "shall not at any time be allowed to charge a greater amount than five cents for any one fare or ticket or ride in their cars through the said city." The company accepted July 23, 1906, the provisions of the constitution of Delaware of 1897. Incor. Rec. L, vol. 2, p. 534. In June, 1910, the charter of the company was further amended, Incor. Rec. P, vol. 3, p. 467, providing, among other things:

"The said corporation shall further have power to lease or demise or otherwise dispose of by any contract partaking of the nature of a lease or demise, for any term not exceeding one thousand years, its real estate and railways as the same are now located and constructed, or as the same may be hereafter located and constructed; in pursuance of any and every lawful authority now existing, or which may hereafter exist, together with all the branches, extensions, sidings, turnouts, tracks, rights of way, fixtures, equipment, choses in action, wires, rolling stock, real and personal property of every nature and description, easements, licenses, public and private, liberties, appurtenances, tenements, hereditaments, of whatever kind or description, and wherever situate, now held, owned, used or controlled by said company, and which at any time hereafter or during the term of such lease may be by it held, owned, used or acquired, incident to or connected with the maintenance, operation, construction or extension of its said railways and appurtenances, and also all the rights, powers, privileges and franchises which now or at any time hereafter or during the term of such lease may be lawfully possessed, exercised or enjoyed in or about the use, operation, management, maintenance, renewal, extension, improvement, or ownership of its railways, property and appurtenances aforesaid."

The Front Street company was chartered February 20, 1877, chapter 432, vol. 15, Del. Laws, with power to "locate, construct, operate and maintain a city railway, for the carriage of passengers and freight for compensation, within the city of Wilmington." An amendment passed April 8, 1891, chapter 188, vol. 19, Del. Laws, conferred upon the company "the privilege also of extending such railway to any place or places outside of said city, to the distance of not more than six miles beyond the city limits" and provided that the company "shall not at any time be allowed to charge a greater amount than five cents for any one fare or ticket or ride in their cars through the said city." June 1, 1910, the company accepted the provisions of the existing constitution. Incor. Rec. K, vol. 3, p. 597. In June, 1910, the charter of the company was further amended, Incor. Rec. Q, vol. 3, p. 250, con-

ferring upon it a power similar in nature and extent to that given the city railway company to lease or demise its railways and property, etc. The Edgemoor company was chartered April 20, 1906, under the general incorporation act of March 10, 1899, chapter 273, vol. 21, Del. Laws, "for the purpose of constructing, maintaining and operating a railway, for the transportation of freight and passengers" within the city of Wilmington. In June, 1910, the charter of the company was amended, conferring upon it a power similar in nature and extent to that given to the city railway company and the Front Street company to lease or demise its railways and property, etc. The traction company was chartered under the general incorporation act June 25, 1910, with the following, among other, powers:

"To buy, lease, or otherwise acquire, hold, own, mortgage, pledge, sell, assign and transfer, or otherwise dispose of the property, real and personal, rights of way, easements, rights, licenses, public and private, liberties, privileges and franchises, of every description, of any railroad, railway, street car, traction, electric light or power company, and of any other kind of public service or private corporation, whether of this state or of any other state; to manage, operate, administer and control the property, real and personal, rights of way, easements, rights, licenses, public and private, liberties, privileges and franchises, of every description, of any such railroad, railway, street car, traction, electric light or power company, public service corporation or private corporation, whether of this state or of any other state, so bought, leased or otherwise acquired; to do and perform any and all acts and things whatsoever necessary, proper or convenient in the management, operation, administration, control, possession, ownership, or disposal, of any property, real or personal, rights of way, easements, rights, licenses, public and private, liberties, privileges and franchises of every description, of any railroad, railway, street car, traction, electric light or power company, public service corporation or private corporation, whether of this state or any other state, so bought, leased, held or owned by it."

The city railway company, in and by the name of "Railway," by indenture bearing date July 1, 1910, and sealed and delivered on that date, for the considerations therein set forth, leased and demised to the traction company, in and by the name of "Traction," its successors and assigns, among other things, for a term of 990 years then next ensuing, subject to determination as therein provided:

"All its real estate wheresoever located, and any and every interest therein, legal or equitable, and its railways as the same are now located and constructed or as the same may be hereafter located and constructed, in pursuance of any and every lawful authority now existing or which may hereafter exist, together with all the branches, extensions, bridges, sidings, turnouts, tracks, rights of way, easements, licenses public and private, fixtures, equipment, choses in action, liberties, lands, machinery, depots, stables, shops, stations, buildings, structures, improvements, poles, wires, motors, power-houses, engines, boilers, dynamos, electrical plants, electrical apparatus, horses, cars, and other rolling stock, tools, implements, rails, machinery, harness, equipment, stable furniture and other personal property generally of every kind or description, appurtenances, tenements and hereditaments of whatever kind or description and wherever situate, excepting supplies in store rooms, now held, owned, used or controlled by railway, and which at any time hereafter, during the term of this lease, may be by it held, owned, used or acquired, incident to or connected with the maintenance, operation, construction, extension or business of its said railways and appurtenances; also all the rights, powers, privileges and franchises which are now or at any time hereafter during the term aforesaid may be lawfully

possessed, exercised or enjoyed in or about the use, operation, management, maintenance, renewal, extension, improvement or ownership of its railways, property and appurtenances above demised."

On the same day, July 1, 1910, the Front Street company and the Edgemoor company, by indentures bearing that date, for the considerations therein set forth, leased and demised for a similar term, subject to determination as therein provided, their respective railways, property and franchises, to the traction company.

Under these leases from the city railway company, the Front Street company and the Edgemoor company, the traction company has been and is operating the railway lines of the lessor companies. For a while after the incorporation of the city railway company and the Front Street company the rate of fare was eight cents per passenger for a single trip, which rate was voluntarily and gradually reduced until it reached five cents, with certain transfer privileges. The established rate charged by the traction company and its lessor companies never has been less than five cents, although for a period of ten years or more prior to August 13, 1911, on the request of passengers using the lines of the above mentioned companies six tickets in a strip were sold to them for twenty-five cents. In the absence of such request fare was collected at the established rate of five cents. The extension of this privilege or option to obtain six tickets for twenty-five cents, instead of five tickets for that amount, did not abolish or suspend the established five cent rate. By order of the traction company the sale of strip tickets or six fares for twenty-five cents was discontinued on the leased lines operated by it from and after August 13, 1911. Under these circumstances Thomas M. Monaghan presented to the utility board August 18, 1911, a written complaint, as follows:

"Wilmington, Del., Aug. 18, 1911.

"To the Honorable Board of Public Utilities.

"Gentlemen: I desire to respectfully present the following complaint. The Wilmington & Philadelphia Traction Company has abolished the strip tickets (six for twenty-five cents) and I ask your Commission to immediately summon said company to appear and present reasons for this action. Any proof in support of this complaint will be furnished at any time your Board may appoint.

"Very respectfully,                      Thomas M. Monaghan.

"No. 700 West 4th St."

Monaghan's complaint was simply that "The Wilmington & Philadelphia Traction Company has abolished the strip tickets (six for twenty-five cents)." He did not allege that the discontinuance of the sale of such tickets was in any respect either unlawful or unreasonable. The only proof he undertook to furnish was to support the complaint, namely, that the traction company had discontinued the sale of six fares for twenty-five cents, and his only prayer was that the utility board "immediately summon said company to appear and present reasons for this action." The complaint contained absolutely no issuable allegation, save the fact of discontinuance, which could hardly be disputed. It did not aver that the established five cent fare was unjustifiable or improper. It assumed, apparently without regard to

chartered rights or the financial necessities of the traction company, that the public interest demanded that six full five cent fares should be sold for twenty-five cents, and thereby five-sixths of a cent be saved on each strip to those who wished to invest twenty-five cents at once in fares. Doubtless there are many persons in the community who would find it convenient or profitable were the traction company to carry them for a fare of one cent or free or give them a bonus for riding on its cars; and with persons so carried the company would enjoy unbounded popularity. But such self-sacrificing altruism toward the general public would hardly be compatible with proper regard for the interests of those who in good faith have invested their money in the railway enterprise in the legitimate and natural expectation of a fair and reasonable return. However, by direction of the utility board, notice was served on the traction company that the former would hear and examine the above complaint August 22, 1911, at the city hall in Wilmington. On the last named day the traction company appeared by its president and counsel and presented to the utility board an answer to the complaint, as follows:

"Wilmington, Del., August 22, 1911.

"To the Board of Public Utility Commissioners for the City of Wilmington.

"Gentlemen: Your notice of August 18th, 1911, issued in accordance with the Resolution of your Board the same day upon the complaint of Mr. Thomas M. Monaghan et al. duly received. In recognition of your notice The Wilmington & Philadelphia Traction Company in answer to the complaint of the said Thomas M. Monaghan et al. says:

"(1) It is true that by an order of the Wilmington and Philadelphia Traction Company said company ceased to sell to the public after Sunday, the 13th day of August, what the complainant has styled 'Strip Tickets'; or 'Six Tickets for Twenty-five Cents.'

"(2) While the traction company recognizes the propriety of the Board of Public Utility Commissioners entertaining any complaint properly brought before them, and the corresponding propriety for the traction company to make reply thereto, the traction company respectfully states that its action was taken, as it is advised, clearly within the chartered authority of its lessor companies and within its own legal rights. The traction company would further state that this action was not taken hastily or without due consideration, but on the contrary with a view of the fulfillment of its obligations to the city of Wilmington, as a corporation, to the traveling public and to its employees, creditors and stockholders. The traction company further submits that it is not within the jurisdiction of the Board of Public Utility Commissioners or any other tribunal to make orders relative to the rate of fare which it should charge, within the limits of five cents per passenger.

"Very respectfully,          Wilmington & Philadelphia Traction Co.
                                        "By Oscar T. Crosby, President.
"Ward, Gray & Neary, Counsel."

This answer presented to the utility board the contention of the traction company, in substance, as follows: First, that its action in discontinuing the strip tickets was "clearly within the chartered authority of its lessor companies and within its own legal rights"; second, that such action "was not taken hastily or without due consideration, but on the contrary with a view of the fulfillment of its obligations to the city of Wilmington, as a corporation, to the traveling public, and to its employés, creditors and stockholders"; and, third, that

"within the limits of five cents per passenger" it was not in the power of the utility board or any other tribunal "to make orders relative to the rate of fare which it should charge."

The subject of the discontinuance by the traction company of the sale of strip tickets in connection with Monaghan's complaint came before the utility board for consideration at two meetings, held August 22 and September 1, 1911. And at the conclusion of the latter meeting, without the examination of a book or the swearing of a witness, and solely upon an admission drawn from the counsel for the traction company, not by Monaghan, but by the counsel for the utility board, that for a period of ten years prior to August 13, 1911, strip tickets had been sold by the traction company and its lessors, the order in question in this suit was made. The complainants contend that the enforcement of this order would involve a violation of article I, section 10 of the Constitution of the United States, providing that no state shall pass any law "impairing the obligation of contracts"; of the fourteenth amendment of the Constitution of the United States, providing that no state shall "deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws"; and of certain provisions in the constitution of Delaware. It is unnecessary to consider in this connection the prohibitions contained in the constitution of Delaware. Further, while incidental reference will be made to article I, section 10 of the Constitution of the United States, it will not be necessary on the present application to determine whether the enforcement of the order is or is not forbidden by section 10 of that article.

[1] A number of jurisdictional questions have been presented and argued by counsel, as well as certain points touching the propriety or regularity of proceeding in this court under the circumstances for the injunctive relief prayed. But the substantial inquiry on the merits is whether the enforcement of the order of the utility board would or probably would contravene either or both of the provisions of the fourteenth amendment, forbidding any state to deprive any person of life, liberty or property without due process of law, or to deny to any person within its jurisdiction the equal protection of the laws. It is well settled that corporations are equally with individuals within the protection of the fourteenth amendment with respect to their property. Subject to a legitimate exercise of the police power, no state can deprive them of their property without due process of law, or deny them the equal protection of the laws, or, as it has been judicially paraphrased, of the protection of equal laws. The prohibition is leveled against such deprivation or denial by a state, whether by direct act of the legislature or by any other state instrumentality. In Chicago, Burlington, etc., R. v. Chicago, 166 U. S. 226, 17 Sup. Ct. 581, 41 L. Ed. 979, the court through Mr. Justice Harlan said:

"The prohibitions of the amendment refer to all the instrumentalities of the state, to its legislative, executive and judicial authorities, and, therefore, whoever by virtue of public position under a state government deprives another of any right protected by that amendment against deprivation by the state 'violates the constitutional inhibition; and as he acts in the name and for the state, and is clothed with the state's power, his act is that of the

state.' This must be so, or, as we have often said, the constitutional prohibition has no meaning, and 'the state has clothed one of its agents with power to annul or evade it.' "

And again, in Raymond v. Chicago Traction Co., 207 U. S. 20, 28 Sup. Ct. 7, 52 L. Ed. 78, 12 Ann. Cas. 757, the court through Mr. Justice Peckham said:

"The provisions of the fourteenth amendment are not confined to the action of the state through its legislature, or through the executive or judicial authority. Those provisions relate to and cover all the instrumentalities by which the state acts, and so it has been held that, whoever by virtue of public position under a state government, deprives another of any right protected by that amendment against deprivation by the state, violates the constitutional inhibition; and as he acts in the name of the state and for the state, and is clothed with the state's powers, his act is that of the state."

[2] The utility board is an instrumentality of the state of Delaware for the accomplishment of public purposes and its acts in and about matters committed to it are the acts of the state. The suggestion that in so far as such an instrumentality acts irregularly, wrongfully or illegally it does not represent the state, because the state has not authorized it so to act, is utterly unsound. If it were otherwise the fourteenth amendment would possess no practical efficiency with respect to the action or threatened action by such instrumentality; for no relief could be had under that amendment against irregular, wrongful or illegal action taken or threatened by it, while in the absence of such irregular, wrongful or illegal action there would be nothing to complain of and consequently no occasion for asking or possibility of obtaining relief. The material consideration is whether the state instrumentality in denying a person or depriving him of the protection of the amendment is acting virtute officii, or proceeding under the grant of authority given it by the state, or within the general scope of its functions, and not whether in so acting it is acting irregularly, wrongfully or illegally. [3] The proceeding instituted by Monaghan through the presentation of his complaint to the utility board was for the purpose of compelling the traction company to receive from those, who were ready and willing to pay at one time twenty-five cents for street car fares, only four and one-sixth cents for each fare, instead of the established rate of five cents per fare. In this manner it was sought to take or deprive the traction company of its property. This could not constitutionally be done "without due process of law." The decisions leave no doubt as to the general features and requirements of due process of law. While it varies according to the nature of the proceeding, in such a proceeding as that under consideration notice and a fair opportunity to defend are essentials. In Iowa Central Railway Co. v. Iowa, 160 U. S. 389, 16 Sup. Ct. 344, 40 L. Ed. 467, the court through Mr. Justice, now Chief Justice, White said:

"It is clear that the fourteenth amendment in no way undertakes to control the power of a state to determine by what process legal rights may be asserted or legal obligations be enforced, provided the method of procedure adopted for these purposes gives reasonable notice and affords fair opportunity to be heard before the issues are decided."

In Simon v. Craft, 182 U. S. 427, 21 Sup. Ct. 836, 45 L. Ed. 1165, the court through the same learned judge said:

"The essential elements of due process of law are notice and opportunity to defend. In determining whether such rights were denied we are governed by the substance of things and not by mere form. * * * The due process clause of the fourteenth amendment does not necessitate that the proceedings in a state court should be by a particular mode, but only that there shall be a regular course of proceedings in which notice is given of the claim asserted and an opportunity afforded to defend against it."

In Hooker v. Los Angeles, 188 U. S. 314, 23 Sup. Ct. 395, 47 L. Ed. 487, 63 L. R. A. 471, the court through Mr. Chief Justice Fuller said:

"The fourteenth amendment does not control the power of a state to determine the form of procedure by which legal rights may be ascertained, if the method adopted gives reasonable notice and affords a fair opportunity to be heard."

In Twining v. New Jersey, 211 U. S. 78, 29 Sup. Ct. 14, 53 L. Ed. 97, the court through Mr. Justice Moody refers to the requirements of due process of law, namely, that "the court which assumes to determine the rights of parties shall have jurisdiction" and that "there shall be notice and opportunity for hearing given the parties" as "two fundamental conditions, which seem to be universally prescribed in all systems of law established by civilized countries." [4] In the light of these principles, so reiterated as to have become elementary, was due process of law observed by the utility board in the procedure which resulted in the making of the order complained of? Was the traction company accorded a fair hearing and an adequate opportunity of presenting its defense to Monaghan's indefinite complaint? As has appeared, the traction company in its answer set forth, in substance, that its action in discontinuing the strip tickets was within the chartered authority of the lessor companies and within its own legal rights; that such discontinuance was ordered after due consideration and in view of its obligations to the city of Wilmington, the traveling public, and its employés, creditors and stockholders; and that it was not in the power of the utility board "within the limits of five cents a passenger" to make orders touching the rate of fare to be charged. Here was an answer involving grave questions of fact and law, presented by a reputable company rendering important service to the traveling public, which it was the duty of the utility board to allow the traction company a full, fair and adequate opportunity of supporting. The utility board had power to make orders touching rates only "after hearing upon notice"; and "hearing" in this connection means a fair and bona fide hearing. It was thoroughly equipped under the law of its being for conducting a full investigation of all matters in dispute, whether of fact or law. The city solicitor was ex officio its legal adviser whose especial duty it was to advise it upon matters of law and procedure. And it had full power to make all needful rules for its proceedings, to engage the services of expert accountants to assist it, and to compel the attendance of witnesses and the production of books, papers, accounts and documents. Thus fully

armed with the means of investigation and decision there could be no legitimate excuse for an omission to accord the traction company full opportunity to present its defense.

Monaghan having made his complaint, and the traction company having put in its answer, it was incumbent upon the utility board in the performance of its duty, judicial in its preliminary stages and legislative at the end, to observe strict impartiality toward the parties. Although there is some conflict, apparent rather than real, in the affidavits, it satisfactorily appears that at the meeting of August 22, 1911, the utility board through its counsel positively refused to take into consideration the charters or chartered rights of the traction company and the lessor companies. Monaghan in his affidavit alleges that at that meeting the traction company stated to the utility board both through its counsel and its president that the traction company had the charter right to charge a straight fare of five cents, and that neither the utility board nor any other tribunal could compel them to reduce that fare by selling six tickets for twenty-five cents; and that the utility board through its counsel replied that that was a question that should be decided by the courts and the board could not assume to decide that question in favor of the traction company in view of the power given the utility board by the statute which created it. Henry P. Scott, who was present at the meeting of August 22, 1911, alleges in his affidavit, in substance, that, after the counsel for the traction company had denied the right or power of the utility board to regulate the rates of fare to be charged "within the limits of five cents per passenger" and Crosby had stated that the position of the traction company was that the right to suspend the sale of strip tickets was a charter right not to be abolished by any tribunal, Vance, one of the members of the utility board, asked that the traction company "produce the various franchises under which it is operated" and that "before any answer could be made to this request" the members of the utility board decided to go into an executive session "to map out their proceedings" and retired with their counsel for a conference. It is not stated at whose request or instance the members of the utility board retired for a conference before any answer could be made to the request of Vance that the traction company "produce the various franchises under which it is operated." The affidavit then proceeds as follows:

"After the conference Mr. Hastings announced that he had advised the Board that, regardless of whatever the charter rights may be, it had a right to make an order upon the company to restore the sale of tickets, unless the company choose to make a defense on the merits of the case at this time; that the complaint made a prima facie case, and the company must put in a defense on the merits or the commission would make an order upon the company with respect to the matter of rates. Mr. Neary at this point stated that he was ready to offer to the Board evidence of the company's charter rights. The Board refused to receive such evidence and Mr. Neary asked whether the Board would disregard the company's charter rights. Mr. Hastings replied that under the conditions of this case he would advise the commission to make an order regardless of the charter rights of the company. He further stated that he did not feel that he should be called upon to decide the legal questions involved in the consideration of the charter rights

of the company and that he did not intend to enter into a consideration of any such questions; that the commission had the right on the face of the law and that he would advise them to assume jurisdiction, and further, that if there was one chance of upholding the law he thought the commission should take that chance."

Crosby in his affidavit in chief fully corroborates the foregoing statement of Scott. There is no contradiction of their allegation that Vance, one of the members of the utility board, requested at the meeting of August 22, 1911, that the traction company "produce the various franchises under which it is operated" or that the utility board, without waiting for any reply to this request, retired with its counsel for a conference, or that the utility board after the conference, under the advice of its counsel, refused to take into consideration the charter rights and franchises of the traction company. Certain affidavits on the part of the utility board have been presented to the effect that the affiants were present at the meeting of August 22, 1911, and heard the president of the utility board say that the board would receive any testimony or evidence that the traction company desired to offer, and that the latter company did not offer any evidence. Indeed, the affiant John S. Hamilton speaking of that meeting says:

"That he knows positively as one who was there during the entire hearing, that at no time was the Wilmington and Philadelphia Traction Company refused an opportunity to put in evidence anything it wanted; that the counsel for the board repeatedly stated to the officers and counsel for the traction company that the board was prepared to consider anything that the company should lay before it."

If the above statement was intended by the affiant to apply to an opportunity on the part of the traction company to put in evidence its charter rights and have the same considered by the utility board it is grossly misleading and not only in conflict with the affidavits of Monaghan, Scott and Crosby, but with controlling evidence hereinafter quoted. If, on the other hand, it was intended to apply only to the introduction of testimony or evidence, other than charter rights, it may in a qualified sense be correct. The affiant Artemus Smith states in effect that he was present during the whole meeting of August 22, 1911, and is positive that at no time during that meeting did the counsel for the traction company or its officers "offer to introduce into evidence any charters, leases or other documents." If this statement means that no charters, leases or other documents were offered in evidence, it is literally and technically true; for while the traction company appeared at that meeting pursuant to notice, there is no evidence that it had been required to bring with it or had with it at that time its charers, leases or other documents. Such a statement is not inconsistent with a refusal by the utility board, without an actual offer, to consider such charters, leases or documents. It appears from the affidavits of Crosby and Scott, and without contradiction, that the president of the utility board stated at its meeting August 22, 1911, that "the position of the board was that of persons trying to find out where they stood." And Taylor, Cleaver, Pierce, Vance and Bacher, all the members of the board, state in their affidavits:

"That none of the members of the said board are lawyers and upon legal questions are compelled to rely upon the advice of the city solicitor who is the board's legal adviser."

If the utility board and its counsel did not know what was the proper procedure to adopt time would have been well spent in duly considering the subject and formulating such rules and regulations as might be necessary for an orderly investigation of the case before them, and its just determination upon the merits, instead of precipitately plunging ahead in the dark. For, as already stated, the act conferred on the utility board power to make all needful rules and regulations for its proceedings, to compel the attendance of witnesses and the production of books, papers, accounts and documents, and to swear witnesses and issue subpœnas. The court does not perceive that any exigency existed which could demand or justify summary and irregular methods in dealing with so important a matter as an adjustment of rates to be charged by the traction company. No formal conclusion was reached by the utility board August 22, 1911, and an adjournment was taken until August 31, 1911, and a further adjournment until September 1, 1911. The proceedings of the meeting on the last named day were taken down stenographically by Charles G. Guyer and reproduced by him in typewriting and duly verified on his oath as a full verbatim report of what was said on that occasion. The correctness and accuracy of Guyer's report has not in any respect been disputed or questioned on either side. At the meeting September 1, 1911, Herbert H. Ward, Esq., appeared as counsel for the traction company. Guyer's affidavit in connection with those of Crosby, Scott and Monaghan fully establishes the fact that the utility board, acting under the advice of its counsel, absolutely refused to take into consideration what the traction company deemed and claimed to be important rights acquired by and secured to it under its charter and the leases of the lessor companies. Guyer's report is in part as follows:

"Mr. Ward: As I understand it, the board, at the meeting—the minutes of which have just been read—[August 22, 1911], decided that they would not, as a preliminary to the making of an order, consider what the charter rights of the company were, and that the counsel for the board, representing the commission, stated that he would not submit any opinion to the board upon that point, but that the board in effect, decided that the only question which they would consider was a question as to the reasonableness of the rate of five cents. Is that a correct statement of the position?

"President Taylor: That is true.

"Mr. Ward: * * * As I understand the position of the board is that on a complaint, such as Mr. Monaghan has filed, they put it up immediately to the person or company cited in, and that before they make their order they will make no inquiry as to the legal right of the person cited in to do the thing which he is doing and about which complaint is made. Of course, you realize that this question of rates is, probably, the biggest and most difficult question, both of fact and of law, that your board would ever have to consider, and I think it is a misfortune to you and a misfortune to the General Assembly that created you and to the community, and certainly a misfortune to us, that it is the first question that has come before you before you have established rules of your government and established bases of judgment in accordance with which we could put in evidence. I submit to you that the decision of the board practically leaves us only one thing to do. Our rights are our rights. Our rights consist of facts and law, and for the

board to announce in one breath 'we will not consider your legal rights, but will direct you to put in evidence, or ask you to put in evidence,' that creates a situation which is impossible, absolutely impossible, legally or equitably. I cannot conceive of a board of utilities taking that position. * * * The position of the board practically leaves us—and what I have said has led me up to this, and I have tried to explain our position, so that you, at least, will feel that we have only this thing that we are doing, or that we can do. If the board declines to consider our rights as rights, we do not feel that we can put in evidence. That is one ground why we do not feel that we can put in evidence, and the ground, as I stated a moment ago, that our rights are a compound· of facts and law, and if you decline to consider our legal rights, why should we offer evidence? How can we offer evidence? What is the issue? Of course, the issue before this board is not so simple as, 'Did we or not stop selling strip tickets, six for a quarter?' That is not the question of fact before the board. The question of fact before the board is whether that was a reasonable order that we made, whether we may reasonably, under our rights, charge five cents. But what is the rule by which we shall establish reasonableness? Has the board laid down any principles on which we can introduce evidence? Has anybody come in here and stated that our charge was unreasonable? If they had said it was unreasonable, would that give us any basis upon which we could introduce evidence, not knowing what the board would finally establish as a rule of unreasonableness? The point I am trying to make plain to you· is that we cannot introduce evidence at large, helter skelter, without knowing what point we are aiming at, or what straight edge we must hew along. As the case stands now, for us to put in evidence would be folly, because we have nothing to prove. There is no issue before the board, and naturally we cannot put in evidence.

* * * * * * * * * * * *

"Mr. Hastings: Mr. Ward, I am certain that it is due to you, at least, and probably to myself and to everybody concerned in this question, to explain my position, and to state, as you already know, that the commission is largely relying upon me for their advice as to how they should proceed in determining this question. It is new to them. It is new· to me. I have taken the law ·and read that, and have undertaken to follow that as best I could. It seems to me that any lawyer, if he stops to think a minute, will agree that my position is correct, when I take the position that this board should take jurisdiction and should not put it up to their legal adviser to advise them whether or not they can do this thing. I have taken the position that this law gives this board jurisdiction over the rates charged by public utilities. That is what the law on its face gives to them. Whether or not their charter rights will enable them to charge five cents, or any other rate of fare, it seems to me should not be left to a board not consisting of lawyers, and the burden of deciding that question should not be put upon any official. Suppose, for instance, I should examine that question and I should agree with counsel for the traction company that they were within their rights, and I should write an opinion to this board that they were, in my judgment, within their rights, what would my position be? If you think for a moment you can see I couldn't live in this town with such an opinion over my signature. In the first place, I take it that there are fully fifty per cent. of the lawyers that would say 'Hastings is wrong; I don't agree with him'; I take it that ninety per cent. of the people would say that he was wrong. Why should I shoulder that responsibility upon myself and thereby relieve the traction company, assuming that I should agree with you, that the question is right. ·I go further than that, and I say that if I should examine the question and should conclude with you that in my judgment in court you could establish your position and show that this commission had no jurisdiction over your rates. if I should examine that question and should come to that conclusion, I ·should say to this board, 'Gentlemen, on the face of this thing you are given jurisdiction to act, and my advice to you is to act and let the court say whether or not my opinion and the opinion of· the counsel for the traction company is correct, or whether

it is incorrect.' The court is the person to decide that, and it seems to me it is no great hardship upon this traction company to put them in court to decide that one question.

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

"Mr. Hastings: We inquired the other day, and I understood the traction company was going to look it up and admit it, as to how long the sale of these strip tickets had been in existence before this order was made. Mr. Ward: If we knew we should be willing to admit it but it is a question. Mr. Hastings: Eight or ten years? Mr. Ward: I really do not know. If you want us to say eight years or ten years, we will say it—whichever you prefer. Mr. Hastings: I do not want you to say anything except the facts. Mr. Ward: I do not know what the facts are. Mr. Hastings: I want to get it on the record that it has been in existence for some years. Upwards of ten years? Mr. Ward: We think you can say upwards of ten years. Mr. Hastings: That will be entered on the record, that that is admitted."

The affidavits show that when the traction company appeared before the utility board August 22, 1911, and through its president offered to answer any questions pertinent to the investigation, the utility board, through its counsel, inquired if it was the position of the traction company that it would "answer only on interrogation" and on being informed that the company was present to furnish to the utility board any information that it might desire pertinent to the investigation, asked how long strip tickets had been on sale in Wilmington. The president of the traction company stated he was not sure as to the length of time such tickets had been on sale, but that the traction company would supply that information. The counsel for the utility board said that he wanted the time fixed and have it go into the record of the proceedings before the utility board.

The situation which confronted the utility board September 1, 1911, made it incumbent on its legal adviser to instruct it as to the proper course of procedure by which the "merits of the matters forming the basis of the order" it might make should be justly and intelligently determined as between the parties, and a proper record of its action be made for the purpose of an appeal to the superior court, should one be taken. Nine days had elapsed since the traction company had first appeared before the utility board, when its attention had been drawn to the fact that no proper rules or regulations for the hearing of the case were in existence, and there was no legitimate reason why in the interim it should not, under the advice of its counsel, have adopted some rational and proper course or method of procedure, worthy of the name of due process of law, and calculated for the attainment and not the defeat of justice. It is an absurdity to suppose that within the intent of the act a hearing and determination of the "merits of the matters forming the basis of the order" do not involve questions of law as well as of fact, or that chartered rights may be wholly ignored. It was the right of the traction company to have its claim of chartered power to charge a "straight five cent fare," made and insisted on in good faith, considered by the utility board, whatever might have been the conclusion thereafter reached by the board as to the existence of such power. It is difficult to conceive of treatment more arbitrary, injurious or ruthless than that to which the traction company was subjected by the utility board. A malefactor taken

redhanded in the commission of crime would have had a constitutional right to a measure of protection and consideration denied to the traction company. The board, influenced and practically controlled by its own counsel, instead of maintaining an attitude of judicial and legislative impartiality as between Monaghan and those he may be supposed to have represented, and the traction company, became the prosecutor and displayed a spirit of partisanship and hostility toward that company from the beginning to the end of the hearings on August 22 and September 1, 1911. Yet it does not appear that there was any discourtesy or want of respect on the part of the traction company toward the utility board or any act or conduct of the former intended or calculated to provoke animosity on the part of the latter. While the utility board professed itself ready to hear from the traction company a "defense on the facts" tending to show a straight five cent fare was only reasonable, Monaghan's complaint did not charge that such a fare was unreasonable, no rules or principles of procedure had been adopted by the board, and it, through its counsel, had absolutely refused to give any consideration to the chartered rights of the traction company, whatever they might be. The traction company was thus placed in an intolerable and practically impossible position. Knowing that any appeal it might take would be heard and determined by the superior court "on the merits of the matters forming the basis of the order" and having been arbitrarily, intentionally and wrongfully denied any consideration by the utility board of the chartered rights upon which it relied, it was justified in declining to put in only a part of its defense. Under the circumstances its course was reasonable and sensible and such as would have been pursued by any one intending not to be precluded from an assertion of his rights in a proper tribunal. The utility board having, through its counsel, obtained from the traction company an admission that strip tickets, six for twenty-five cents, had been sold by it for a period of ten years prior to August 13, 1911, without any intimation of the use to be made of such admission, took, through its counsel, the position that the uninterrupted sale of strip tickets on such terms during that period gave rise to a prima facie presumption that it would be unreasonable to refuse to sell six fares for only twenty-five cents, or in other words to charge twenty-five cents for only five fares where the purchaser desired to obtain for that sum six fares. On the basis of this reasoning the order complained of was made, imposing the maximum penalty.

[5] If such a prima facie presumption existed as was claimed on the part of the utility board it was rebuttable, and the traction company had a right to rebut it, but was prevented from and practically denied that right through the refusal of the board to allow it to make a full defense as well on the law as the facts. The board was not entitled to the benefit of any presumption of the kind while excluding the traction company from the benefit of a full defense. In Mobile, etc., Railroad Co. v. Turnipseed, 219 U. S. 35, 31 Sup. Ct. 136, 55 L. Ed. 78, 32 L. R. A. (N. S.) 226, Ann. Cas. 1912A, 463, the court through Mr. Justice Lurton used the following language, approved by the same

court in Lindsley v. Natural Carbonic Gas Co., 220 U. S. 61, 82, 31 Sup. Ct. 337, 55 L. Ed. 369:

"That a legislative presumption of one fact from evidence of another may not constitute a denial of due process of law or a denial of the equal protection of the law it is only essential that there shall be some rational connection between the fact proved and the ultimate fact presumed, and that the inference of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate. So, also, it must not, under guise of regulating the presentation of evidence, operate to preclude the party from the right to present his defense to the main fact thus presumed."

But as in the case of an act of the legislature the creation of a prima facie presumption will not avail where the person against whom it is urged is precluded from fully presenting his evidence in rebuttal, so here, in the absence of such a legislative act, the utility board can take nothing by its claim of prima facie presumption.

[6] It does not appear that any member of the utility board possessed experience, special training or information rendering him competent in the absence of proper evidence laid before him to form a reliable opinion upon the reasonableness or unreasonableness of "a straight five cent fare." It is obvious that the fact that another trolley line may have sold six tickets for twenty-five cents is wholly inconclusive. Excellence of service, commodiousness of cars, cost of construction and many other factors representing varying conditions may render a price for tickets which is wholly reasonable in the one case, unreasonable in the other. So it is evident that the mere unexplained fact that a trolley line during a former period may have sold six tickets for twenty-five cents affords at most very slender support to a contention that a subsequent change from six to five tickets for that sum involves an unreasonable exaction from the traveling public. Cost of maintenance, change in wages, and a variety of other circumstances may fully justify such increase in price. Clothed with ample power fully to investigate the merits of the case and do equal justice between the parties the utility board allowed itself to be led into a course of action which was the antithesis of "due process of law." An examination of the affidavits has produced the conviction that it is at least very doubtful whether "a straight five cent fare" is unreasonable. And if for the purpose of the present application it must consequently be assumed that the discontinuance of the sale of six tickets for twenty-five cents was reasonable and justifiable, it must be held that the order made by the utility board was an attempt to deprive the traction company of its property without due process of law.

[7] Much was said at the hearing and is contained in the briefs of counsel touching the question of the jurisdiction of this court to entertain this suit. The act of March 3, 1875, c. 137, 18 Stat. 470, as amended by the acts of March 3, 1887, c. 373, 24 Stat. 552, and August 13, 1888, c. 866, 25 Stat. 433 (U. S. Comp. St. 1901, p. 508), provides that:

"The circuit courts of the United States shall have original cognizance, concurrent with the courts of the several states, of all suits of a civil nature, at common law or in equity, where the matter in dispute exceeds, exclusive

of interest and costs, the sum or value of two thousand dollars, and arising under the Constitution or laws of the United States," etc.

Diversity of citizenship is unnecessary in such cases. This suit when brought satisfied the jurisdictional requirements above mentioned. It was instituted after the judicial code of the United States of March 3, 1911, c. 231, 36 Stat. 1087 (U. S. Comp. St. Supp. 1911, p. 128), was enacted, but before the date of its going into effect, which was January 1, 1912. By virtue of the judicial code the circuit courts of the United States were abolished on the last named date, and this suit was transferred from the circuit court of the United States to the district court. Section 290 of the judicial code provides, among other things, that all suits pending in the circuit courts on the date of its taking effect should thereupon and thereafter be proceeded with and disposed of in the district courts in the same manner and with the same effect as if originally begun therein. And section 299 provides, among other things, that:

"The repeal of existing laws, or the amendments thereof, embraced in this act, shall not affect * * * any suit or proceeding * * * pending at the time of the taking effect of this act," etc.

[8] Hence the principles and authorities which would be pertinent on the question of jurisdiction of the circuit court of the United States, had the judicial code not been enacted, are pertinent to the consideration of jurisdiction of this suit as transferred to this court. In Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 Sup. Ct. 192, 53 L. Ed. 382, 15 Ann. Cas. 1034, in which appeals had been taken from the circuit court of the United States for the southern district of New York, a bill had been filed by the Consolidated Gas Company of New York against the city of New York, the attorney general of New York, and the gas commission of New York, to enjoin the enforcement of certain legislative acts and of an order made by the gas commission, which subsequently became the public service commission, relative to rates for gas in New York city. The jurisdiction of the circuit court had been challenged. The Supreme Court in sustaining the jurisdiction of the circuit court said through Mr. Justice Peckham:

"At the outset it seems to us proper to notice the views regarding the action of the court below, which have been stated by counsel for the appellants, the public service commission, in their brief in this court. They assume to criticize that court for taking jurisdiction of this case, as precipitate, as if it were a question of discretion or comity, whether or not that court should have heard the case. On the contrary, there was no discretion or comity about it. When a Federal court is properly appealed to in a case over which it has by law jurisdiction, it is its duty to take such jurisdiction (Cohens v. Virginia, 6 Wheat. 264, 404 [5 L. Ed. 257]), and in taking it that court cannot be truthfully spoken of as precipitate in its conduct. That the case may be one of local interest only is entirely immaterial, so long as the parties are citizens of different states or a question is involved which by law brings the case within the jurisdiction of a Federal court. The right of a party plaintiff to choose a Federal court where there is a choice cannot be properly denied."

Raymond v. Chicago Traction Co., 207 U. S. 20, 28 Sup. Ct. 7, 52 L. Ed. 78, 12 Ann. Cas. 757; Prentis v. Atlantic Coast Line, 211 U. S. 210, 29 Sup. Ct. 67, 53 L. Ed. 150; Home Telephone Co. v.

Los Angeles, 211 U. S. 265, 278, 29 Sup. Ct. 50, 53 L. Ed. 176; Minneapolis v. Street Railway Co., 215 U. S. 417, 30 Sup. Ct. 118, 54 L. Ed. 259; City of Owensboro v. Cumberland Tel. & Tel. Co., 174 Fed. 739, 99 C. C. A. 1; Detroit v. Detroit Citizens' St. Ry. Co., 184 U. S. 368, 22 Sup. Ct. 410, 46 L. Ed. 592; Cleveland v. Cleveland City Railway Co., 194 U. S. 517, 24 Sup. Ct. 756, 48 L. Ed. 1102; Siler v. Louisville & Nashville R. R. Co., 213 U. S. 175, 29 Sup. Ct. 451, 53 L. Ed. 753; Walla Walla v. Walla Walla Water Co., 172 U. S. 1, 19 Sup. Ct. 77, 43 L. Ed. 341; City Railway Co. v. Citizens' Railroad Co., 166 U. S. 557, 17 Sup. Ct. 653, 41 L. Ed. 1114; and Love v. Atchison, T. & S. F. Ry. Co., 185 Fed. 321, 107 C. C. A. 403—were all heard on appeal from the circuit court of the United States, and on the question of jurisdiction are in line with Willcox v. Consolidated Gas Co. Other cases, not on appeal, but in line with Willcox v. Consolidated Gas Co. on the question of jurisdiction are Spring Valley W. Co. v. City & County of San Francisco (C. C.) 165 Fed. 657; Delaware, L. & W. R. Co. v. Stevens (C. C.) 172 Fed. 595; Atchison, T. & S. F. Ry. Co. v. Love (C. C.) 174 Fed. 59; and San Francisco G. & E. Co. v. City, etc., of San Francisco (C. C.) 189 Fed. 943.

At the conclusion of the hearing on the present application the counsel for the utility board referred to Barney v. City of New York, 193 U. S. 430, 24 Sup. Ct. 502, 48 L. Ed. 737, and Seattle Electric Co. v. Seattle, R. & S. Ry. Co., 185 Fed. 365, 107 C. C. A. 421. The former case does not seem to have any pertinency to that before the court. There a bill had been filed to enjoin the city of New York, the board of rapid transit commissioners, and others from proceeding with the construction of a certain rapid transit railroad tunnel in a place not included in the "routes and general plan" adopted with reference to the construction of such tunnel, on the ground that it would deprive the complainant of his property without due process of law in violation of the fourteenth amendment. The court through Mr. Chief Justice Fuller said:

"The city acts through the Rapid Transit Board, which possesses the powers specifically vested. It is empowered to prescribe the routes and general plan of any proposed rapid transit railroad within the city, and every such plan must 'contain such details as to manner of construction as may be necessary to show the extent to which any street, avenue or other public place is to be encroached upon and the property abutting thereon affected.' Consents of the municipal authorities and the abutting property owners to construction on the routes and plan adopted must be obtained, and any change in the detailed plans and specifications shall accord with the general plan of construction, and, if not, like consents must be obtained to such change. The bill asserted that the easterly tunnel section under Park avenue was not within the routes and general plan consented to, and that the construction was unauthorized. * * * Thus the bill on its face proceeded on the theory that the construction of the easterly tunnel section was not only not authorized, but was forbidden by the legislation, and hence was not action by the State of New York within the intent and meaning of the Fourteenth Amendment. * * * In the present case defendants were proceeding, not only in violation of provisions of the state law, but in opposition to plain prohibitions."

The proceeding there sought to be enjoined was not within the grant of authority conferred. But here the utility board, although

acting irregularly and wrongfully, was proceeding under the grant of authority given it by the state to "hear and examine complaints concerning rates * * * and to make such recommendations and orders as it may deem proper concerning such rates." The distinction in principle between the present case and Barney v. City of New York plainly appears from the latter portion of the opinion in that case. The New York case wholly fails to establish the proposition that the action of the utility board in making the order complained of was not the act of the state. Seattle Electric Co. v. Seattle, R. & S. Ry. Co., 185 Fed. 365, 107 C. C. A. 421, was decided by the circuit court of appeals for the ninth circuit. In the court below a street railway company had obtained a preliminary injunction against another street railway company, restraining the latter from constructing a railway on Rainier avenue in Seattle, under an ordinance of that city, on the ground that the complainant, which had for many years been operating a line of railway along that avenue under an earlier franchise, would by the ordinance obtained by the defendant and such construction be greatly damaged and deprived of property without due process of law in contravention of the Constitution of the United States. On appeal from the interlocutory decree the circuit court of appeals held that the franchise granted to the complainant was not exclusive, and that, as under the franchise granted to the defendant compensation was required to be made for damages occasioned by the laying of tracks, the latter ordinance did not conflict with the Constitution of the United States and therefore the court below was without jurisdiction to entertain the suit. But instead of resting the decision upon that ground the court unnecessarily went further and said:

"But there is a further, and as we believe a conclusive, objection to the claim of right on the part of the complainant to invoke the jurisdiction of the circuit court on constitutional grounds. It seems to us that in no aspect of the grant to the defendant is there a real and substantial dispute or controversy dependent upon the application of provisions of the Federal Constitution. If it should be conceded that in some view of the ordinance and defendant's action under color of its provisions there would be a taking of complainant's property without due process of law, still it would not follow that the circuit court had jurisdiction of the case unless the ordinance in that aspect would be the supreme law of the state. The supreme law of the state is the constitution of the state; and that document provides, in article I, § 3, as does the fourteenth amendment to the Constitution of the United States that: 'No person shall be deprived of life, liberty, or property without due process of law.' Under this provision of the state constitution the ordinance would be as invalid as under the Federal Constitution. It would not be a state law. It would be with respect to the former, as the complainant charges in its complaint with respect to the latter, 'without authority in law, null, and void, and of no force and effect.' The presumption is that the courts of Washington will not deny to any of its citizens or corporations the equal protection of its constitution. If, however, it should turn out that we are mistaken in this respect the complainant will have his remedy on an appeal from the highest court of the state to the Supreme Court of the United States."

The substance of this holding is well stated in the syllabus as follows:

"A suit to enjoin the enforcement of a municipal ordinance on the ground that it will deprive complainant of its property without due process of law

is not within the jurisdiction of a circuit court of the United States as involving a constitutional question, where the state constitution contains a similar prohibition, and the ordinance, if invalid under one, is equally so under the other; the rule being that in such cases the remedy must be first sought in the state courts."

Several things may with propriety be said of this holding. In the first place, it was wholly unnecessary to the determination of the case; the decision being fully supported on the first ground. Second, the cases cited in support of the proposition do not sustain it. They are Barney v. City of New York, 193 U. S. 430, 24 Sup. Ct. 502, 48 L. Ed. 737, which has already been considered, and Hamilton Gaslight Co. v. Hamilton City, 146 U. S. 258, 13 Sup. Ct. 90, 36 L. Ed. 963, where it was held that a city ordinance not passed under legislative authority is not a law of the state within the meaning of the constitutional prohibition against state laws impairing the obligation of contracts. The court through Mr. Justice Harlan said:

"The jurisdiction of that court [the circuit court of the United States] can be sustained only upon the theory that the suit is one arising under the Constitution of the United States. But the suit would not be of that character, if regarded as one in which the plaintiff merely sought protection against the violation of the alleged contract by an ordinance to which the state has not, in any form, given or attempted to give the force of law. A municipal ordinance, not passed under supposed legislative authority, cannot be regarded as a law of the state within the meaning of the constitutional prohibition against state laws impairing the obligations of contracts."

These two cases fall far short of the proposition advanced in Seattle Electric Co. v. Seattle, R. & S. Ry. Co.; and at the same time are clearly distinguishable from the case in hand. While in those cases there was either a legislative prohibition or a lack of legislative authority to construct the tunnel or pass the ordinance, here there is no question as to the legislative authority of the utility board to regulate rates by making "such recommendations and orders as it may deem proper concerning such rates." This distinction was clearly recognized by the circuit court of appeals for the sixth circuit in City of Louisville v. Cumberland Tel. & Tel. Co., 155 Fed. 725, 84 C. C. A. 151, 12 Ann. Cas. 500, where it was held, as stated in the syllabus, that the circuit court of the United States has no jurisdiction to enjoin the enforcement of a municipal ordinance on the ground that it impairs the obligation of a contract or deprives the complainant of property without due process of law, in violation of the Constitution of the United States, when the bill alleges that no power had been granted to the municipality by the constitution or legislature of the state to pass such ordinance. The court through Judge, now Justice, Lurton, said:

"This is a bill filed in the circuit court to restrain the enforcement of a municipal ordinance regulating charges for telephone service in the city of Louisville, on the ground that the ordinance was violative of the obligation of a contract between the complainant and the city, and also on the ground that the rates prescribed were unreasonable, unjust and confiscatory, and, if enforced, would deprive complainants of their property without compensation and without that due process of law guaranteed by the fourteenth amendment. * * * Jurisdiction was invoked upon the contention that this is a suit arising under the Constitution or laws of the United States. That the bill does aver that the ordinance impairs the obligation of a contract

and is also an attempt to deprive complainant of its property without due process of law is plain enough. But the constitutional prohibitions which are invoked run against the state, and the state alone, while the bill of the complainants in plain words negatives state action by averring that 'no power to regulate the rates charged by your orator or other telephone companies' has been granted 'by the constitution or the legislature of the state of Kentucky, or in any other way,' and that the enactment of said ordinance was and is beyond the power of the common council of said city, and the said 'ordinance void and an assumption of power and authority upon the part of the said common council unwarranted and unfounded.' If this be true, there was no state authority behind the action of the Louisville common council, and no ground to claim that constitutional prohibitions have been violated which are pointed at state aggression only. A municipal ordinance may be the exercise of a delegated legislative power conferred upon it as one of the political subdivisions of the state; but, to be given the effect and force of a law of the state, it must have been enacted in the exercise of some legislative power conferred by the state in the premises. * * * If the state has conferred authority upon the municipality to establish and enforce reasonable rates for telephone service then the establishment of rates under this power would be the establishment of rates by the state itself."

As before stated, here the state has conferred authority upon the utility board with respect to the regulation of rates. Third, the proposition advanced in Seattle Electric Co. v. Seattle, R. & S. Ry. Co. seems' essentially unsound. While the constitution of a state is, subject to the Constitution and laws of the United States, the supreme law of the state, the Constitution of the United States is the supreme law of the land, and within the scope of its operation, the supreme law of the state, to the exclusion of any inconsistent provisions in the state constitution or laws. The prohibition of the fourteenth amendment relating to due process of law is self-executing and its scope and force can neither be increased nor diminished by any state. But it does not destroy the state or its instrumentalities. In declaring that no state shall deprive any person of life, liberty or property without due process of law, it prohibits action by the state through any of its instrumentalities which would have that result, and whether the state constitution does or does not contain a similar prohibition is wholly immaterial on the question whether action by a state instrumentality is action by the state and as such forbidden by the amendment. The prohibition of the amendment having precisely the same force and operation in the absence, as in the presence, of a similar prohibition in the state constitution, if in the former case any given action by a state instrumentality would be the act of the state, it would equally in the latter, other things being equal, be the act of the state. The co-existence in the federal and state constitutions of similar prohibitions is unimportant on the question of authority to represent the state, and consequently on the question of the jurisdiction of the circuit court, now the district court, of the United States. Fourth, it is difficult, if not impossible, to reconcile the proposition advanced in Seattle Electric Co. v. Seattle, R. & S. Ry. Co. with the fact that the Supreme Court of the United States has in many cases, of which a number have been hereinbefore cited, recognized and upheld the jurisdiction of the circuit court of the United States over suits for injunctive relief against the orders or legislative action of commissions and other state

instrumentalities, based on the constitutional prohibition in question, in states creating such commissions and instrumentalities and having a similar prohibition in their constitutions. Illinois, Michigan, Minnesota, Virginia, Washington and other states are in this category, each having the constitutional prohibition that "no person shall be deprived of life, liberty, or property without due process of law." Fifth, the circuit court for the northern district of California in San Francisco, G. & E. Co. v. City, etc., of San Francisco (C. C.) 189 Fed. 943, repudiated the proposition advanced in Seattle Electric Co. v. Seattle, R. & S. Ry. Co. in a carefully considered opinion by Judge Van Fleet. The points decided are well summarized in the syllabus as follows:

"A suit by a gas company to enjoin enforcement of a municipal ordinance fixing the price of gas, passed in the exercise of powers conferred by the state constitution, as being confiscatory and depriving complainant of its property without due process of law, in violation of the fourteenth constitutional amendment, presents a federal question under such provision which gives a federal court jurisdiction, notwithstanding the fact that the state constitution contains a like provision, and on the facts alleged in the bill the ordinance would be invalid thereunder.

"Where a state has conferred power on some one of its agencies to perform a certain function involving the exercise of discretion, the performance of such function within that grant, although in a manner to render it obnoxious to the laws of the state, is none the less the act of the state within the contemplation of the constitutional prohibition against deprivation of life, liberty, or property without due process of law."

The learned judge with respect to the contention that the bill did not disclose a case arising under the Constitution or laws of the United States for the reason that the facts stated did not show "state action" said:

"This is predicated upon the argument that, conceding that the state has vested in a tribunal or functionary full and plenary power, as here, to do a certain thing, an act done under such authority is not the act of the state in the sense here involved, unless it be so done as to be legally unassailable; that is, so done that, if passed in review by the highest judicial tribunal of the state, it would necessarily be held valid in form and substance; that anything less than this is not state action. In other words, to apply the principle to the concrete case presented by the bill, that the above provision of the constitution of the state vesting in municipalities the power to fix gas rates must be read in conjunction with the provision of the same instrument that no person shall be deprived of his property without due process of law; and if an ordinance adopted under the supposed authority of the first is found to be obnoxious to the second by fixing rates so unreasonably low as to be confiscatory of the property of those affected, or is invalid for any other reason under the constitution or laws of the state, then the adoption of such ordinance cannot be said to have been had under the authority of the state in a sense to bring it within the prohibition of the fourteenth amendment. * * * This contention, while not new, is nevertheless somewhat startling in view of the history of this character of litigation in the federal courts, wherefrom it has been very generally assumed that the question had been definitely set at rest."

One of the powers conferred on the utility board is "to direct any such public utility as herein defined [including street railways], found to be granting unjust, unfair or unreasonable discriminations, to immediately cease from so doing." In this case the traction company having by its action in August, 1911, confined itself to the former

practice of the lessor companies of charging "a straight five cent fare," the utility board is undertaking, not to secure uniformity in the matter of fares, but to create and enforce a discrimination as between passengers on the one hand who are able and wish to pay for only one fare at a time and those on the other who are able and wish to spend twenty-five cents at a time in tickets; thus compelling the former to pay five cents and the latter only four and one-sixth cents for each fare. Whether this is a just, fair or reasonable discrimination may depend upon the facts when satisfactorily established in the case by plenary proofs. It by no means follows that because such a discrimination formerly was voluntarily made by the lessor companies, and may have been reasonable at the time, the traction company should now, under changed conditions, be forced by the utility board to re-establish such a discrimination. What was reasonable then may have since become the reverse.

A case strongly resembling in some of its features that under consideration is Lake Shore, etc., Railway Co. v. Smith, 173 U. S. 684, 19 Sup. Ct. 565, 43 L. Ed. 858. It there appeared that an act of the legislature of Michigan provided that one thousand mile tickets should be kept for sale at the prices therein named at the principal ticket offices of the railroad companies therein referred to; that such tickets might be made non-transferable, but when so required by the purchaser should be issued in the names of the purchaser, his wife and children; that should any such ticket be presented by any other than the person or persons named thereon the conductor might take it up and collect fare, and thereupon such ticket should be forfeited; and that each one thousand mile ticket should be valid for two years only after the date of purchase. Smith having demanded and been refused a one thousand mile ticket for himself and his wife pursuant to the provisions of the above section applied for and obtained from the state circuit court a mandamus to compel the railway company to issue such ticket upon payment of its price. The supreme court of Michigan affirmed the order granting the mandamus and the case was taken by writ of error to the Supreme Court of the United States, where the judgment of the supreme court of Michigan was reversed on the ground that the act was forbidden by the fourteenth amendment. The court through Mr. Justice Peckham said:

"The two questions of a federal nature that are raised in the record are, (1) whether the act violates the Constitution of the United States by impairing the obligation of any contract between the State and the railroad company; and (2) if not, does it nevertheless violate the fourteenth amendment of the Constitution by depriving the company of its property or liberty without due process of law or by depriving it of the equal protection of the laws. If we should decide that this act violates any provision of the fourteenth amendment it would be unnecessary to examine the question whether there was any contract between the State and the company as claimed by it. We will, therefore, first come to an investigation of the legislative authority with reference to that amendment. If unhampered by contract there is no doubt of the power of a state to provide by legislation for maximum rates of charges for railroad companies, subject to the condition that they must be such as will admit of the carrier earning a compensation that under all the circumstances shall be just to it and to the public, and

whether they are or not is a judicial question. If the rates are fixed at an insufficient amount within the meaning of that term as given by the courts, the law would be invalid, as amounting to the taking of the property of the company without due process of law. * * * The question is presented in this case whether the legislature of a state, having power to fix maximum rates and charges for the transportation of persons and property by railroad companies, with the limitations above stated, and having power to alter, amend or repeal their charters, within certain limitations, has also the right, after having fixed a maximum rate for the transportation of passengers, to still further regulate their affairs and to discriminate and make an exception in favor of certain persons, and give to them a rate of transportation for a less sum than the general rate provided by law. * * * The act is not a general law upon the subject of rates, establishing maximum rates which the company can in no case violate. The legislature having established such maximum as a general law now assumes to interfere with the management of the company while conducting its affairs pursuant to and obeying the statute regulating rates and charges, and notwithstanding such rates it assumes to provide for a discrimination, an exception in favor of those who may desire and are able to purchase tickets at what might be called wholesale rates— a discrimination which operates in favor of the wholesale buyer, leaving the others subject to the general rule. And it assumes to regulate the time in which the tickets purchased shall be valid and to lengthen it to double the period the railroad company has ever before provided. It thus invades the general right of a company to contract and manage its own affairs, and compels it to give the use of its property for less than the general rate to those who come within the provisions of the statute, and to that extent it would seem that the statute takes the property of the company without due process of law. * * * The right to claim from the company transportation at reduced rates by purchasing a certain amount of tickets is classed as a convenience. As so defined it would be more convenient if the right could be claimed without any compensation whatever. But such a right is not a convenience at all within the meaning of the term as used in relation to the subject of furnishing conveniences to the public. And also the convenience which the legislature is to protect is not the convenience of a small portion only of the persons who may travel on the road, while refusing such alleged convenience to all others, nor is the right to obtain tickets for less than the general and otherwise lawful rate to be properly described as a convenience. If that were true the granting of the right to some portion of the public to ride free on all trains and at all times might be so described. What is covered by the word 'convenience,' it might be difficult to define for all cases, but we think it does not cover this case. An opportunity to purchase a thousand-mile ticket for less than the standard rate we think is improperly described as a convenience. The power of the legislature to enact general laws regarding a company and its affairs does not include the power to compel it to make an exception in favor of some particular class in the community and to carry the members of that class at a less sum than it has the right to charge for those who are not fortunate enough to be members thereof. This is not reasonable regulation. * * * Regulations for maximum rates for present transportation of persons or property bear no resemblance to those which assume to provide for the purchase of tickets in quantities at a price lower than the general rate, and to provide that they shall be good for years to come. This is not fixing maximum rates, nor is it proper regulation. It is an illegal and unjustifiable interference with the rights of the company. * * * If the maximum rates are too high in the judgment of the legislature, it may lower them, provided they do not make them unreasonably low as that term is understood in the law; but it cannot enact a law making maximum rates, and then proceed to make exceptions to it in favor of such persons or classes as in the legislative judgment or caprice may seem proper. What right has the legislature to take from the company the compensation it would otherwise receive for the use of its property in transporting an individual or classes of persons over its road, and compel it to transport them free or for a less sum than is provided for by

the general law? Does not such an act, if enforced, take the property of the company without due process of law? We are convinced that the legislature cannot thus interfere with the conduct of the affairs of corporations. But it may be said that as the legislature would have the power to reduce the maximum charges for all, to the same rate at which it provides for the purchase of the thousand-mile ticket, the company cannot be harmed or its property taken without due process of law, when the legislature only reduces the rates in favor of a few instead of in favor of all. It does not appear that the legislature would have any right to make such an alteration. To do so might involve a reduction of rates to a point insufficient for the earning of the amount of remuneration to which a company is legally entitled under the decisions of this court. In that case reduction would be illegal. For the purpose of upholding this discriminatory legislation we are not to assume that the exercise of the power of the legislature to make in this instance a reduction of rates as to all would be legal, and therefore a partial reduction must be also legal. Prima facie, the maximum rates as fixed by the legislature are reasonable. This, of course, applies to rates actually fixed by that body. * * * True it is that the railroad company exercises a public franchise and that its occupation is of a public nature, and the public therefore has a certain interest in and rights connected with the property, as was held in Munn v. Illinois, 94 U. S. 113, 125 [24 L. Ed. 77], and the other kindred cases. The legislature has the power to secure to the public the services of the corporation for reasonable compensation, so that the public shall be exempted from unreasonable exactions, and it has also the authority to pass such laws as shall tend to secure the safety, convenience, comfort and health of its patrons and of the public with regard to the railroad. But in all this we find it neither necessary nor appropriate, in order that the legislature may exercise its full right over these corporations, to make such a regulation as this, which discriminates against it and in favor of certain individuals, without any reasonable basis therefor, and which is not the fixing of maximum rates or the exercise of any such power. * * * It is no answer to the objection to this legislation to say that the company has voluntarily sold thousand-mile tickets good for a year from the time of their sale. What the company may choose voluntarily to do furnishes no criterion for the measurement of the power of a legislature. Persons may voluntarily contract to do what no legislature would have the right to compel them to do. Nor does it furnish a standard by which to measure the reasonableness of the matter exacted by the legislature. The action of the company upon its own volition, purely as a matter of internal administration, and in regard to the details of its business which it has the right to change at any moment, furnishes no argument for the existence of a power in a legislature to pass a statute in relation to the same business imposing additional burdens upon the company. * * * The power to alter or amend does not extend to the taking of the property of the corporation either by confiscation or indirectly by other means. The authority to legislate in regard to rates comes from the power to prevent extortion or unreasonable charges or exactions by common carriers or others exercising a calling or using their property in a manner in which the public have an interest. In this case there is not an exercise of the power to fix maximum rates. There is not the exercise of the acknowledged power to legislate so as to prevent extortion or unreasonable or illegal exactions. The fixing of the maximum rate does that. It is a pure, bald and unmixed power of discrimination in favor of a few of the persons having occasion to travel on the road and permitting them to do so at a less expense than others, provided they buy a certain number of tickets at one time. It is not legislation for the safety, health or proper convenience of the public, but an arbitrary enactment in favor of the persons spoken of, who in the legislative judgment should be carried at a less expense than the other members of the community."

The case now under consideration is not differentiated in principle from Lake Shore, etc., Railway Co. v. Smith by the fact that there the court was dealing with an act of the legislature while here the

court is concerned with the action of the utility board. For that board as an instrumentality of the state created by the legislature cannot possess power superior to that of its creator. Further, while one thousand mile tickets continued in force for only two years and were for the use of the purchaser and his family, the strip tickets continued good indefinitely and could be transferred at will by delivery to other persons. Further, on the assumption that a "straight five cent fare" for each passenger was not unreasonable, it is on principle unimportant, so far as concerns the existence of right on the part of the utility board to enforce the discrimination involved in the sale of six tickets for twenty-five cents, whether those able and willing to purchase such tickets would form a large or only a small proportion of the total number of passengers carried. On the above assumption of the reasonableness of a "straight five cent fare" for all, the loss to the traction company through the sale of the strip tickets would, subject to results flowing from possibly or probably increased patronage, grow with the number sold. Whether a "straight five cent fare" for all would be reasonable or unreasonable cannot safely and satisfactorily be determined on the ex parte affidavits but is a question properly to be decided only after plenary proofs have been adduced in the case. But Lake Shore, etc., Railway Co. v. Smith possibly does not establish the proposition that under no circumstances strip tickets, although involving a discrimination, can be used by a street railway company in connection with single fares. That case did not involve the consideration of fractions of a cent. But a street railway case may have to do with such fractions. It is conceivable that in a given case, and in the absence of any fixed charter rate, a uniform charge of six cents for each fare would be extortionate and unreasonable, while a uniform rate of five cents would be unreasonably low and not insure a legitimate return on the investment, and that the enforcement of it would be confiscatory of the property of the railway company; or a case may be supposed where a similar statement would be applicable as between a uniform rate of five cents and a uniform rate of four cents for each fare. If in the former case a uniform rate of five and two-fifths of a cent, and in the latter a uniform rate of four and three-fifths of a cent, would insure a fair return on the investment, and there were here a coin having the same value relatively to a cent that in France the centime has to a sou there would be no occasion, unless merely as a matter of convenience, for the use of strip tickets, as the five and two-fifths of a cent or the four and three-fifths of a cent could be exactly paid in cents and the lesser coin. In fact the currency of such lesser coin could always allow the payment without discrimination of a uniform fare, reasonable in amount, and exactly or approximately equal to what would insure a fair return on the investment. But in the absence of such lesser coin, and with cents to deal with, it may be the exception and not the rule that a given number of cents will either exactly or approximately represent a uniform fare, just at once to the railway company and to the public. At this point and in the absence of any charter provision fixing and measuring the price of a

fare, two questions may arise not proper to be determined now, namely, first, whether, where circumstances will not allow uniformity of fare with respect to all passengers without injustice to the public, on the one hand, or the railway company on the other, strip tickets in connection with single fares may be resorted to as a means of securing to the railway company a proper return, and at the same time protecting the public against, not inequality, but extortion; and, second, whether uniformity or approximate uniformity of rates, so far as the coinage system of the country will allow can be deemed unreasonable or unequal within the meaning of the fourteenth amendment.

Prentis v. Atlantic Coast Line, 211 U. S. 210, 29 Sup. Ct. 67, 53 L. Ed. 150, is of controlling importance on the question of the right to proceed in the circuit court of the United States without the taking by the traction company of an appeal to the superior court. In that case appeals had been taken from the circuit court of the United States for the eastern district of Virginia by the Virginia state corporation commission. The commission had made an order fixing passenger rates for the Atlantic Coast Line company and certain other railroad companies which were alleged to be confiscatory, and the railroad companies, without taking an appeal from the commission to the supreme court of appeals as provided for in the constitution of Virginia, obtained from the circuit court of the United States final decrees granting injunctive relief against the enforcement of the order. From these decrees appeals were taken to the Supreme Court of the United States. The confiscatory character of the rates was admitted by demurrer in the court below. By way of defense it was claimed that the proceedings before the commission were proceedings in a court of the state which the courts of the United States were forbidden by section 720, U. S. Rev. Stat. (U. S. Comp. St. 1901, p. 581), to enjoin; that section providing that

"The writ of injunction shall not be granted by any court of the United States to stay proceedings in any court of a state, except in cases where such injunction may be authorized by any law relating to proceedings in bankruptcy."

The court through Mr. Justice Holmes said:

"The question principally argued, and the main question to be discussed, is whether the order is one which, in spite of its constitutional invalidity, the courts of the United States are not at liberty to impugn. The State Corporation Commission is established and its powers are defined at length by the constitution of the state. There is no need to rehearse the provisions that give it dignity and importance or that add judicial to its other functions, because we shall assume that for some purposes it is a court within the meaning of Rev. Stats. § 720, and in the commonly accepted sense of that word. Among its duties it exercises the authority of the state to supervise, regulate and control public service corporations, and to that end, as is said by the Supreme Court of Virginia and repeated by counsel at the bar, it has been clothed with legislative, judicial and executive powers. * * * Before prescribing or fixing any rate or charge, etc., it is to give notice * * * of the substance of the contemplated action and of a time and place when the commission will hear objections and evidence against it. If an order is passed, the order again is to be published as above before it shall go into effect. An appeal to the Supreme Court of Appeals is given of right to any party aggrieved, upon conditions not necessary to be stated, and that

court, if it reverses what has been done, is to substitute such order as in its opinion the commission should have made. The commission is to certify the facts upon which its action was based and such evidence as may be required, but no new evidence is to be received and how far the findings of the commission can be revised perhaps is not quite plain. No other court of the state can review, reverse, correct or annul the action of the commission, and in collateral proceedings the validity of the rates established by it cannot be called in doubt. When a rate has been fixed, the commission has power to enforce compliance with its order by adjudging and enforcing, by its own appropriate process, against the offending company the fines and penalties established by law. But a hearing is required, and the validity and reasonableness of the order may be attacked again in this proceeding, and all defenses seem to be open to the party charged with a breach. * * * We shall assume that when, as here, a state constitution sees fit to unite legislative and judicial powers in a single hand, there is nothing to hinder so far as the Constitution of the United States is concerned. * * * We shall assume, as we have said, that some of the powers of the commission are judicial, and we shall assume, without deciding, that, if it was proceeding against the appellees to enforce this order and to punish them for a breach, it then would be sitting as a court and would be protected from interference on the part of courts of the United States. But we think it equally plain that the proceedings drawn in question here are legislative in their nature, and none the less so that they have taken place with a body which at another moment, or in its principal or dominant aspect, is a court such as is meant by section 720. A judicial inquiry investigates, declares and enforces liabilities as they stand on present or past facts and under laws supposed already to exist. That is its purpose and end. Legislation on the other hand looks to the future and changes existing conditions by making a new rule to be applied thereafter to all or some part of those subject to its power. The establishment of a rate is the making of a rule for the future, therefore is an act legislative, not judicial in kind. * * * Proceedings legislative in nature are not proceedings in a court within the meaning of Rev. Stats. § 720, no matter what may be the general or dominant character of the body in which they may take place. * * * The decision upon them cannot be res judicata when a suit is brought. See Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362 [14 Sup. Ct. 1047, 38 L. Ed. 1014]. And it does not matter what inquiries may have been made as a preliminary to the legislative act. Most legislation is preceded by hearings and investigations. But the effect of the inquiry, and of the decision upon it, is determined by the nature of the act to which the inquiry and decision lead up. * * * The nature of the final act determines the nature of the previous inquiry. As the judge is bound to declare the law he must know or discover the facts that establish the law. So when the final act is legislative the decision which induces it cannot be judicial in the practical sense, although the questions considered might be the same that would arise in the trial of a case. If a state constitution should provide for a hearing before any law should be passed, and should declare that it should be a judicial proceeding in rem and the decision binding upon all the world, it hardly is to be supposed that the simple device could make the constitutionality of the law res judicata, if it subsequently should be drawn in question before a court of the United States. And all that we have said would be equally true if an appeal had been taken to the Supreme Court of Appeals and it had confirmed the rate. Its action in doing so would not have been judicial, although the questions debated by it might have been the same that might come before it as a court, and would have been discussed and passed upon by it in the same way that it would deal with them if they arose afterwards in a case properly so called. We gather that these are the views of the Supreme Court of Appeals itself. Atlantic Coast Line Ry. Co. v. Commonwealth, 102 Va. 599, 621 [46 S. E. 911]. They are implied in many cases in this and other United States courts in which the enforcement of rates has been enjoined, notwithstanding notice and hearing, and what counsel in this case call litigation in advance. * * * Litigation cannot arise until the moment of legislation is passed. * * *

It seems to us clear that the appellees were not bound to wait for proceedings brought to enforce the rate and to punish them for departing from it. Those, we have assumed in favor of the appellants, would be proceedings in court and could not be enjoined; while to confine the railroads to them for the assertion of their rights would be to deprive them of a part of those rights. If the railroads were required to take no active steps until they could bring a writ of error from this court to the Supreme Court of Appeals after a final judgment, they would come here with the facts already found against them. But the determination as to their rights turns almost wholly upon the facts to be found. Whether their property was taken unconstitutionally depends upon the valuation of the property, the income to be derived from the proposed rate and the proportion between the two.—pure matters of fact. When those are settled the law is tolerably plain. All their constitutional rights, we repeat, depend upon what the facts are found to be. They are not to be forbidden to try those facts before a court of their own choosing if otherwise competent. 'A state cannot tie up a citizen of another state, having property within its territory invaded by unauthorized acts of its own officers, to suits for redress in its own courts.' * * * Although the appeal is given as a right, it is not a remedy, properly so called. At that time no case exists. We should hesitate to say, as a general rule, that a right to resort to the courts could be made always to depend upon keeping a previous watch upon the bodies that make laws, and using every effort and all the machinery available to prevent unconstitutional laws from being passed. It might be said that a citizen has a right to assume that the constitution will be respected, and that the very meaning of our system in giving the last word upon constitutional questions to the courts is that he may rest upon that assumption and is not bound to be continually on the alert against covert or open attacks upon his rights in bodies that cannot finally take them away. It is a novel ground for denying a man a resort to the courts that he has not used due diligence to prevent a law from being passed. * * * No rate is irrevocably fixed by the state until the matter has been laid before the body having the last word. * * * On the question of contract as on that of confiscation it is reasonable and proper that the evidence should be laid, in the first instance, before the body having the last legislative word."

Yet, while fully recognizing the jurisdictional power of the circuit court to entertain the bills, the Supreme Court for reasons having no application to the case in hand, directed that they be retained to await the result of appeals if the railroad companies saw fit to take them. The court said:

"It appears to us that the most plausible objection to these bills is not the one most dwelt upon in argument, but that they were brought too soon. * * * Our hesitation has been on the narrower question whether the railroads, before they resorted to the circuit court, should not have taken the appeal allowed to them by the Virginia constitution at the legislative stage, so as to make it absolutely certain that the officials of the state would try to establish and enforce an unconstitutional rule. * * * The question that we are considering may be termed a question of equitable fitness or propriety, and must be answered on the particular facts. * * * The railroads went into evidence before the commission. They very well might have taken the matter before the Supreme Court of Appeals. No new evidence and no great additional expense would have been involved. The state of Virginia has endeavored to impose the highest safeguards possible upon the exercise of the great power given to the State Corporation Commission, not only by the character of the members of that commission, but by making its decisions dependent upon the assent of the same historic body that is entrusted with the preservation of the most valued constitutional rights, if the railroads see fit to appeal. It seems to us only a just recognition of the solicitude with which their rights have been guarded, that they should make sure that the State in its final legislative action would not respect what they think

their rights to be, before resorting to the courts of the United States. If the rates should be affirmed by the Supreme Court of Appeals and the railroads still should regard it as confiscatory, it will be understood from what we have said that they will be at liberty then to renew their application to the circuit court, without fear of being met by a plea of res judicata. It will not be necessary to wait for a prosecution by the commission. We may add that when the rate is fixed a bill against the commission to restrain the members from enforcing it will not be bad as an attempt to enjoin legislation or as a suit against a state, and will be the proper form of remedy. * * * There is yet another difficulty in applying to these cases the comity which it is desirable if possible to apply. The Virginia statute of April 15, 1903, enacted to carry into effect the provision of the constitution, requires, by section 34, certain, if not all, appeals to be taken and perfected within six months from the date of the order. 1 Pollard's Code of Virginia, c. 56a, 714. It may be that when an appeal is taken to the Supreme Court of Appeals this section will be held to apply and the appeal be declared too late. We express no opinion upon the matter, which is for the state tribunals to decide, but simply notice a possibility. If the present bills should be dismissed, and then that possible conclusion reached, injustice might be done. As our decision does not go upon a denial of power to entertain the bills at the present stage but upon our views as to what is the most proper and orderly course in cases of this sort when practicable, it seems to us that the bills should be retained for the present to await the result of the appeals if the companies see fit to take them. If the appeals are dismissed as brought too late the companies will be entitled to decrees. If they are entertained and the orders of the commission affirmed, the bills may be dismissed without prejudice and filed again."

On "the particular facts" controlling the "question of equitable fitness or propriety" the court, while admitting the circuit court's "power to entertain the bills at the present stage," retained them to await the result of any appeals the railroad companies should see fit to take. But the particular facts there were wholly different from those here. First, whatever doubt there was in that case as to the application of the six months limitation of the right to appeal, there can be no doubt here that no appeal could be taken save "within thirty days from the date of service" of the order; for the act creating the utility board specifically provides this limitation. Thus the traction company could by no possibility secure relief by appeal. Second, on an appeal from the state corporation commission to the supreme court of appeals the latter tribunal was clothed with legislative functions. It had the powers of affirmation, reversal and substitution. It was "the body having the last legislative word." But here the utility board, and not the superior court, was the body having the last legislative word. Its order was "a legislative act by an instrumentality of the state exercising delegated authority." Grand Trunk Ry. v. Indiana R. R. Comm., 221 U. S. 400, 31 Sup. Ct. 537, 55 L. Ed. 786, citing Prentis v. Atlantic Coast Line, 211 U. S. 210, 29 Sup. Ct. 67, 53 L. Ed. 150. [9] Admittedly the superior court has no legislative function to perform on an appeal. Its duty is purely judicial. It is without authority to amend or correct the order of the utility board or substitute another order for it. Its duty is merely that of affirmation or reversal. It is "given jurisdiction to hear and determine such appeal on the merits of the matters forming the basis of the order." The proceeding on the appeal being purely judicial and in a state court could not

be enjoined by a court of the United States. Section 720, U. S. Rev. Stat. Third, in view of the foregoing considerations, had the traction company taken an appeal to the superior court it would have elected the state tribunal instead of the federal, been bound by such election, and deprived of the right thereafter to have its constitutional rights passed on by a circuit court of the United States. Fourth, in the Virginia case the railroad companies went into evidence before the state corporation commission and there is nothing to show that they were not afforded an adequate opportunity to present their defense or that it was denied fair and full consideration. The Supreme Court said, "They very well might have taken the matter before the Supreme Court of Appeals," and after paying high tribute to both the commission and the court of appeals said:

"It seems to us only a just recognition of the solicitude with which their [the railroad companies'] rights have been guarded, that they should make sure that the state in its final legislative action would not respect what they think their rights to be, before resorting to the courts of the United States."

But here the proceedings before the utility board, far from being due process of law, were a travesty upon justice; and upon the board, and not the superior court, devolved "final legislative action." But beyond and in addition to the foregoing considerations the utility board practically prevented the traction company from taking an appeal to the superior court, and now cannot equitably found upon the absence of such an appeal any objection to the propriety of the maintenance of this suit. As before stated, the superior court is given jurisdiction to hear and determine the appeal "on the merits of the matters forming the basis of the order," and the court is authorized to prescribe by rule the procedure on the appeal. Pursuant to this authority and about three weeks after the order in question had been made by the utility board the court adopted the following rule:

"When an appeal is taken from an order made by the Board of Public Utility Commissioners for the City of Wilmington, the same shall be heard and determined by the Superior Court upon the record of the proceedings had before said Commissioners. Upon the filing of the notice of appeal in any case, the Prothonotary shall forthwith issue citation to the appellee returnable within ten days, and shall also forthwith issue notice to the said Board of Public Utility Commissioners to be served upon any member thereof, and to be returned within ten days, commanding them to send to said court, together with the notice, the record of their proceedings in the case, certified under the hand of the Secretary and seal of the Commissioners."

[10] As the superior court on appeal is confined to the record of the proceedings before the utility board as certified by its secretary, and the appeal must be heard and determined "on the merits of the matters forming the basis of the order," it is evident that the traction company, if not permitted by the utility board to present by way of defense to "a prima facie case" made against it matters of law or fact deemed by it essential as affecting the merits, as appears to have been the case here, it would naturally be deterred from taking an appeal, even were it necessary to take one under ordinary circumstances before proceeding in the circuit court of the United States to enjoin the order. Further, the character of the record of the proceedings

before the utility board was such as might also have some effect in deterring the traction company from taking an appeal. While under the act creating the utility board it is made the duty of its secretary to "record the proceedings" of the board it appears from the affidavit of Herman B. Bothum, the secretary, and from other affidavits, that the record of the proceedings of the board August 22, 1911, and September 1, 1911, were defective and incomplete. He states that he kept an accurate account of the "material things done and said at such meeting"; that with respect to the meeting August 22, 1911, he did not transcribe "all that was said in the discussion upon the subject before the board," but did "take down and make notes of all things of any importance"; and that the exhibit attached to his affidavit is a true and correct "report of the record" made by him at the hearings in question, "as the same appears upon the minute book kept by him of the meetings of said board." It does not appear that the affiant Bothum is a lawyer or possessed qualifications enabling him to determine what portions of the proceedings were "material" or "of any importance" and what portions not material or important. It was certainly his duty to make a faithful record setting forth in effect, if not literally, all matters of substance said or done in connection with the hearing of Monaghan's complaint. Yet precisely the features which deprive the proceedings of all semblance of due process of law were omitted by him from his report or record. Further, the affidavits show that even the recitals forming part of the order complained of are misleading and unfair. This case does not disclose any of the features which induced the court in Prentis v. Atlantic Coast Line as a matter of "equitable fitness or propriety" or of "the most proper and orderly course in cases of this sort when practicable," to retain the bills to await the result of appeals should the railroad companies see fit to take them. With respect to the point now under consideration this case falls directly within the general principle enunciated in Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 Sup. Ct. 192, 53 L. Ed. 382, 15 Ann. Cas. 1034. In the latter case it is important to observe that the action of the court in Prentis v. Atlantic Coast Line was explained on the ground that the complainants should have taken the appeal "while the rate of fare in litigation was still at the legislative stage." On this point Atchison, T. & S. F. Ry. Co. v. Love (C. C.) 174 Fed. 59, and Love v. Atchison, T. & S. F. Ry. Co., 185 Fed. 321, 107 C. C. A. 403, being the same case on appeal, are instructive. Judge Hook in the court below, in reference to Prentis v. Atlantic Coast Line, said:

"On appeals to the Supreme Court of the United States it was held that the proceedings for fixing rates and charges whether in the commission or in the state court of appeals on appeal were legislative in character, although the principal aspect of those tribunals may be judicial; and it was said, in substance, but in carefully measured terms, that the legislative process fixing the rates complained of was not so complete as to give an absolute, unqualified right to resort to the courts, and that considerations of comity and equitable fitness or propriety would be best subserved by an appeal by the railroad companies from the legislative order of the commission to the state court of appeals. * * * The doctrine of the Virginia cases does not apply, because the prescription of the passenger rate had passed the legislative stage, and had become a completed rule of action."

198 F.—13

In the same case on appeal Judge Sanborn, delivering the opinion of the circuit court of appeals for the eighth circuit, with respect to the Virginia case, said:

"The Supreme Court of the United States' did not deny the jurisdiction of the United States circuit court, or its power to issue the injunctions, but held that the function of the supreme court of appeals of Virginia on the appeal from the order of the commission was legislative, and that, as the legislative process of fixing the rate was not complete until an appeal had been taken and had been determined, or until the time to take it had expired, the more courteous and orderly course of procedure would be for the companies to pursue their appeal to the supreme court of appeals of Virginia before they sought relief from the national court."

But here the making of the order complained of was the end and full completion of all legislative action, and the time limited by the act creating the utility board for taking an appeal had expired before the suit was brought.

On the question how far and on what grounds the courts may be justified in enforcing the furnishing of six five cent fares for twenty-five cents, the cases seem to be more or less variant. Minneapolis v. Street Railway Co., 215 U. S. 417, 30 Sup. Ct. 118, 54 L. Ed. 259, was an appeal from a decree of the circuit court of the United States enjoining the city of Minneapolis from enforcing against the Minneapolis Street Railway Company an ordinance of that city requiring the sale of six tickets for twenty-five cents, in violation of a contract with the railway company growing out of a prior ordinance which was ratified by the legislature of Minnesota, giving the company a right to charge five cents for the transportation of each passenger. The court, in affirming the decree below enjoining the enforcement of the latter ordinance, through Mr. Justice Day said:

"We think that the requirement of the ordinance, that the company should operate its road by the sale of tickets six for a quarter, as required by the ordinance of February 9, 1907, was an enactment by legislative authority which impaired the obligation of the contract then held and owned by the complainant company."

Detroit v. Detroit Citizens' St. Ry. Co., 184 U. S. 368, 22 Sup. Ct. 410, 46 L. Ed. 592, was the same in principle and similarly decided. But, as heretofore stated, it is unnecessary to consider the contract impairment clause of the constitution on the present application. In City of Reading v. United Traction Co., 232 Pa. 303, 81 Atl. 304, a bill had been filed by the city against the United Traction Company, the Front & Fifth Street Railway Company and the Reading Transit Company; the United Traction Company having been the lessee of the various street railways in Reading including the Front & Fifth Street railway, and the Reading Transit Company having become the lessee of the United Traction Company. It appeared that Walter A. Rigg, son of the president of the United Traction Company, wrote a letter October 6, 1906, to the chairman of the railways committee of Reading, in which it was stated that if certain rights and privileges were granted with respect to the Front & Fifth Street line and the Schuylkill Avenue line "there would be no increase in fare." In consequence of this letter in connection with previous negotiations an ordinance

was passed December 8, 1906, granting the desired rights and privileges and providing that "the rate of fare shall not exceed five (5) cents for a single fare, or six tickets for twenty-five (25) cents." March 18, 1910, the United Traction Company discontinued the sale of strip tickets at the rate of six for twenty-five cents on all the leased lines, and on the above mentioned bill an injunction issued commanding the operating company to "restore and continue the practice as to the sale of tickets on its cars pursued prior to March 18, 1910"; and commanding it "to sell to passengers on the cars of the said United Traction Company in the city of Reading six tickets for twenty-five cents, each ticket constituting one fare." On appeal the supreme court of Pennsylvania reversed the decree below and dismissed the bill, the court through Mr. Justice Brown saying:

"The bill avers and the answer admits that for years prior to the date of the filing of the bill the rate of fare charged by the United Traction Company for a continuous passage, with transfers at various intersections of its railways, had been five cents, or, at the option and request of passengers, six tickets, each constituting one fare, were sold for twenty-five cents and each of said tickets was good for a ride upon any of the cars of the company at any time and was accepted in the same manner and to the same effect as if a cash fare of five cents had been paid. What the company did after the letter of October 6, 1906, from Walter A. Rigg, and the approval of the ordinance permitting the connection of the Front & Fifth Street Railway Company's track with the Schuylkill Avenue line, was merely a continuance of what it had done of its own motion for a long time prior thereto, and, not having been required by any law, ordinance, contract or agreement with the city to introduce a strip system, or to continue it, the company's right was to discontinue it at any time prior to the approval of the ordinance which in the opinion of the learned chancellor below, has imposed upon the company the duty of selling to all passengers on its cars in the city of Reading six tickets for twenty-five cents, each ticket constituting one fare and good on any of its lines. The question before us is not whether, under the ordinance, the United Traction Company ought to be compelled to sell six tickets for twenty-five cents, good over the Schuylkill Avenue or Front & Fifth Street railway line. The bill was not filed for the purpose of having that question determined. * * * Even assuming that Rigg was authorized to act for the United Traction Company, or, if not authorized to act for it, that it subsequently ratified what he did, what was done by him that committed the company to an agreement to continue for all time to sell six tickets for twenty-five cents, each good for a single fare over any one of the lines operated by it? His letter to the chairman of the railways committee of councils related solely to the proposed change in the operation of but two of the lines leased by the traction company. They were the Schuylkill Avenue and the Front & Fifth Street lines. * * * As there was nothing in Rigg's letter to indicate that when he wrote he had in his mind all of the lines operated by the traction company, so there is nothing in the ordinance to indicate that the sale of six tickets for twenty-five cents, good over all of its lines, was to be continued by the United Traction Company; and one of its valuable rights is not to be taken from it by any process of reasoning to show that, under the circumstances, it had impliedly agreed to surrender such right. * * * Nothing in the letter nor in the ordinance can be construed into an agreement by the United Traction Company to continue the general sale of strip tickets, and its right was, and the right of the Reading Transit Company, its successor, is, to charge a fare of five cents for every passenger riding on its lines, except as it may be committed by the ordinance of December 8, 1906, to continue to sell six tickets for twenty-five cents, good to or from points on the Schuylkill Avenue and Front & Fifth Street railway lines. That question, however, is not to be passed upon until it is properly raised."

The above case is a distinct authority to the effect that, except in so far as the United Traction Company may have been mediately or immediately bound by contract to sell six tickets for twenty-five cents, it could not be compelled to do so. The above case left two points open for future determination; first, whether the ordinance of December 8, 1906, in connection with Rigg's letter of October 6, 1906, constituted a binding contract for the sale of strip tickets, and if so, second, what railway lines were within the scope of that contract. On these two points the court of common pleas for Berks county passed in Reading v. Transit Co., 4 Berks Co. L. J. 189, holding that there was a binding contract and that consequently the sale of strip tickets could be compelled thereunder. But the court expressly based its decision upon the ground of contract. It said:

"The Supreme Court in that case [City of Reading v. United Traction Co.] explicitly declined to pass upon the question (as one not raised in it) whether the Traction Co., and the Transit Co. as its successor, are committed to a continuation of the sale of 6 tickets for 25 cents 'good to or from points on the Schuylkill Avenue and Front & Fifth Street railway lines.' That question is therefore still open; and it is the question and the only question presented in this case. The city, indeed, does not in its bill claim that the defendant companies are bound to sell tickets on any other part of their railway system connecting, by continuous circuit or by transfer, with the lines mentioned, good from the point of sale to points upon the latter lines. * * * Here we have to do with an understanding expressly formulated in the Traction Co.'s proposition to the city, upon the footing and faith of which the franchise was indisputably granted, and relating to the operation of that very franchise as part of a single and physically unbroken circuit."

In Sternberg v. State, 36 Neb. 307, 54 N. W. 553, 19 L. R. A. 570, decided in 1893, it appeared that an ordinance of the city of Lincoln provided with respect to street railways that:

"No company shall charge or receive more than 5 cents fare for each passenger carried on any of said roads, nor more than 25 cents for each package of 6 tickets."

The municipal code of Lincoln provided that the railway company there dealt with "shall be subject to all reasonable regulations in the construction and use of said railway which may be imposed by ordinances." It was held that the ordinance was valid, upon the ground that:

"The general regulations and control of such railways are under the police powers of the city government, and the municipality may enact all reasonable rules for that purpose."

In the same year, also, Detroit v. Ft. Wayne & B. I. R. Co., 95 Mich. 456, 54 N. W. 958, 20 L. R. A. 79, 35 Am. St. Rep. 580, was decided. It is similar in principle to and follows Sternberg v. State. The right of the city of Detroit by ordinance to compel the sale of eight tickets for twenty-five cents was upheld upon the ground of the police power of that city. If a necessary condition for the granting or operation of a street railway franchise be that the company shall issue strip tickets, and the company accepts the franchise, it, of course, becomes contractually bound to issue such tickets. But the police power of the state cannot be invoked at will to deprive a railway corporation of

its property by an arbitrary and unreasonable adjustment of rates. In order to justify a compulsory reduction in the fares to be collected by the traction company the facts as well as the law of the case should be fully developed and considered in plenary proceedings; for, while the traction company should not be permitted to exact unlawful and exorbitant fares from the public, it must be borne in mind that, in the language of the court in Missouri Pacific Ry. v. Nebraska, 217 U. S. 196, 206, 30 Sup. Ct. 461, 462, 54 L. Ed. 727, 18 Ann. Cas. 989:

"Railroads after all are property protected by the constitution, and there are constitutional limits to what can be required of their owners under either the police power or any other ostensible justification for taking such property away."

[11] On the point of equitable in contradistinction to legal relief there can be no question. The complainants are not obliged to wait for an indefinite period in order to obtain defensive relief in actions which may be brought in the state court for the recovery of the penalty of one hundred dollars per day, even if they could successfully defend without first having had the order complained of declared invalid. They are entitled to the protection of this court against the enforcement of that order and their remedy is properly and, indeed, necessarily, in equity for injunctive relief. There is nothing for which the complainants could here maintain an action at law. It is not a question whether equity furnishes a more convenient remedy. It gives the only remedy, there being no legal remedy whatever in this court under the circumstances.

[12] On the question of the circumstances determinative of the propriety of granting or withholding preliminary injunctions there are certain well settled principles. The granting or refusal of a preliminary injunction, whether mandatory or preventive, calls for the exercise of a sound judicial discretion in view of all the circumstances of the particular case. Regard should be had to the nature of the controversy, the object for which the injunction is sought, and the comparative hardship or convenience to the respective parties involved in the awarding or denial of the injunction. [13] The legitimate object of a preliminary injunction, preventive in its nature, is the preservation of the property or rights in controversy until the decision of the case on a full and final hearing upon the merits, or the dismissal of the bill for want of jurisdiction or other sufficient cause. The injunction is merely provisional. It does not, in a legal sense, finally conclude the rights of parties, whatever may be its practical operation under exceptional circumstances. In a doubtful case, where the granting of the injunction would, on the assumption that the defendant ultimately will prevail, cause greater detriment to him than would, on the contrary assumption, be suffered by the complainant, through its refusal, the injunction usually should be denied. [14] But where, in a doubtful case, the denial of the injunction would, on the assumption that the complainant ultimately will prevail, result in greater detriment to him than would, on the contrary assumption be sustained by the defendant through its allowance, the injunction usually should be granted. The balance of convenience or hard-

ship ordinarily is a factor of controlling importance in cases of substantial doubt existing at the time of granting or refusing the preliminary injunction. Such doubt may relate either to the facts or to the law of the case, or to both. It may equally attach to or widely vary in degree as between the showing of the complainant and that of the defendant, without necessarily being determinative of the propriety of allowing or denying the injunction. Where, for instance, the effect of the injunction would be disastrous to an established and legitimate business through its destruction or interruption in whole or in part strong and convincing proof of right on the part of the complainant and of the urgency of his case is necessary to justify an exercise of the injunctive power. [15] Where, however, the sole object for which an injunction is sought, is the protection of property or legitimate business, or the maintenance of the status quo, until the question of right between the parties can be decided on final hearing, the injunction properly may be allowed, even though there be serious doubt of the ultimate success of the complainant. There is abundant authority in support of these views. Russell v. Farley, 105 U. S. 433, 438, 26 L. Ed. 1060; City of Newton v. Levis, 79 Fed. 715, 25 C. C. A. 161; Glascott v. Lang, 3 Myl. & C. 451, 455; Hadden v. Dooley, 74 Fed. 429, 431, 20 C. C. A. 494; Great Western R. Co. v. Birmingham, etc., R. Co., 2 Phil. Ch. 597; Shrewsbury & Chester R. Co. v. Shrewsbury R. Co., 1 Sim. N. S. *410, *426, *427, *432; Denver & R. G. R. Co. v. United States, 124 Fed. 156, 59 C. C. A. 579; Buskirk v. King, 72 Fed. 22, 18 C. C. A. 418; Sanitary Reduction Works v. California Reduction Co. (C. C.) 94 Fed. 693; Southern Pac. Co. v. Earl, 82 Fed. 690, 27 C. C. A. 185; New Memphis Gas & Light Co. v. Memphis (C. C.) 72 Fed. 952; Indianapolis Gas Co. v. Indianapolis (C. C.) 82 Fed. 245; Georgia v. Brailsford, 2 Dall. 402, 1 L. Ed. 433. The application of these principles to the case in hand not only justifies but requires the awarding of a preliminary injunction. The only evidence before the court, aside from the bill and its exhibits, consists of ex parte affidavits, which are inconclusive and to a certain extent conflicting on material points. The evidence, such as it is, preponderates on the side of the complainants. But the case is not ripe for final decision, and to render one now would be both premature and improper. A final decision should be reached only after a thorough, orderly and rigid investigation of the facts, in connection with the law, so conducted as to allow the application of the usual and most satisfactory test of truth, namely, the examination, cross examination and re-examination of witnesses, and also the production of books, papers and accounts. Further, the "balance of convenience or hardship" here operates in favor of the complainants. While the granting of a preliminary injunction will temporarily require those to pay "a straight five cent fare" who would prefer to save five-sixths of a cent on each fare by purchasing six tickets for twenty-five cents, the refusal of such injunction might seriously embarrass and possibly prove disastrous to the established business and property of the traction company. An interlocutory decree for a preliminary injunction may be prepared and submitted.